71 Cal.Rptr.3d 7 (2007)
158 Cal.App.4th 1336
COMMUNITIES FOR A BETTER ENVIRONMENT et al., Plaintiffs and Appellants,
v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT et al., Defendants and Respondents;
ConocoPhillips Company, Real Party in Interest and Respondent.
Carlos Valdez et al., Plaintiffs and Appellants,
v.
South Coast Air Quality Management District, Defendant and Respondent;
ConocoPhillips Company, Real Party in Interest and Respondent.
No. B193500.
Court of Appeal of California, Second District, Division Two.
December 18, 2007.
As Modified on Denial of Rehearing January 16, 2008.
*10 Communities for a Better Environment, Adrienne L. Bloch and Shana Lazerow, Oakland, for Plaintiffs and Appellants Communities for a Better Environment.
Adams Broadwell Joseph & Cardozo, Marc D. Joseph, Richard T. Drury, San Francisco, for Plaintiffs and Appellants Carlos Valdez et al.
Woodruff, Spradlin & Smart, Bradley R. Hogin, Orange, Edward L. Bertrand; South Coast AQMD, Kurt R. Wiese and Barbara Baird, Diamond Bar, for Defendant and Respondent South Coast Air Quality Management District.
Weston Benshoof Rochefort Rubalcava & MacCuish, Ward L. Benshoof, Jocelyn D. Thompson, Los Angeles; Cox Castle & Nicholson and Michael H. Zischke, San Francisco, for Real Party in Interest and Respondent.
Center on Race Poverty and the Environment and Luke Cole, San Francisco, for Amici Curiae, in support of Plaintiffs and Appellants Communities for a Better Environment and Carlos Valdez et al.
for Amicus Curiae State of California, in support of Plaintiffs and "Appellants Carlos Valdez et al.
Certified for Partial Publication.[*]
DOI TODD, J.
Plaintiffs and appellants Communities for a Better Environment, Carlos Valdez, Southern California Pipe Trades District Council No. 16 and Steamfitters and Pipefitters Local 250 appeal from a judgment entered against them in their actions against defendant and respondent the South Coast Air Quality Management District (SCAQMD) and real party in interest and respondent ConocoPhillips Company (ConocoPhillips). The dispute concerned the potential environmental impacts resulting from a project enabling ConocoPhillips to produce ultra 16w sulfur diesel. Appellants' primary contentions are that the SCAQMD abused its discretion in allowing a permit for the project to be issued without the preparation of an environmental impact report and without review pursuant to a regulation implementing a federal level of review.
We affirm in part and reverse in part. We conclude that the SCAQMD abused its discretion in issuing a negative declaration for the diesel fuel manufacturing project at issue because appellants offered substantial evidence supporting a fair argument that the project's nitrogen dioxide emissions may have a significant effect on the environment. In finding no significant effect, the SCAQMD improperly relied on a baseline level of permitted emissions which did not reflect existing physical conditions. In all other respects, the SCAQMD properly exercised its discretion in concluding that the project would not have a significant adverse environmental impact. The SCAQMD also properly declined to apply a local regulation to evaluate the project's permit, as the regulation was ineffective at the time the SCAQMD issued its permit.

FACTUAL AND PROCEDURAL BACKGROUND

The Parties.
Appellant Carlos Valdez resides in Wilmington near the ConocoPhillips refinery. *11 Appellants the Southern California Pipe Trades District Council 16 and the Steamfitters & Pipefitters Local 250 are labor organizations who have many members who live and/or work in Wilmington and throughout the South Coast Air Basin. Appellant Communities for a Better Environment is a nonprofit membership organization with two offices in California. For approximately 25 years, it has been active in California air quality issues; its goals include protecting and enhancing the environment and public health by reducing air pollution in California's urban areas.
Respondent the SCAQMD is the agency principally responsible for comprehensive, non-vehicular air pollution control in the South Coast Air Basin, an area that includes Orange County and the non-desert portions of Los Angeles, Riverside and San Bernardino Counties. (Health & Saf. Code, §§ 40000, 40410; Cal.Code Regs., tit. 17, § 60104.) Pursuant to federal and state law, the SCAQMD is responsible for adopting an air quality management plan (AQMP) that identifies the air pollution control measures and emission reductions from existing sources that are necessary for compliance with federal and state ambient air quality standards. (See 42 U.S.C. § 7410; Health & Saf.Code, § 40460.) The SCAQMD is authorized to adopt rules and regulations to carry out the AQMP. (Health & Saf.Code, § 40440.)
Respondent and real party in interest ConocoPhillips is the largest petroleum refiner in the United States. ConocoPhillips' Los Angeles Refinery (Refinery) operates at two different sites in the South Coast Air Basinthe Wilmington plant and the Carson plant. The Wilmington plant consists of approximately 400 acres bordering commercial, recreational and residential areas. It produces a variety of products including gasoline, jet fuel, diesel fuel, petroleum gases, sulfuric acid and sulfur.

Diesel Fuel Regulations.
In January 2001, the United States Environmental Protection Agency (EPA) published rules on diesel fuels standards requiring that by June 1, 2006 refiners must begin selling highway diesel fuel meeting a maximum sulfur standard of 15 parts per million by weight (ppmw). (40 C.F.R. § 80.) This deadline corresponded with the EPA requirement that by 2007 all on-road, diesel-fueled vehicles be equipped to run on Ultra-Low Sulfur Diesel (ULSD) fuel. Before the adoption of these rules, most California diesel fuel contained an average of 140 ppmw of sulfur.
Even before the adoption of the EPA rule, the SCAQMD's Rule 431.2 (Sulfur Content of Liquid Fuels) was amended on September 15, 2000 to require a reduction in diesel fuel sulfur content to 15 ppmw by mid-2006.[1] Subsequently, in 2003 the CARB amended California's diesel fuel regulations to comport with the low sulfur limit imposed by federal and local rules. The 15 ppmw requirement was also reflected in the state's AQMP. The diesel fuel sulfur content changes were designed to reduce the harmful environmental effects resulting from emissions of sulfur oxides (SOx), particulate matter (PM), nitrogen oxides (NOx) and other toxins from diesel-fueled motor vehicles.

The Project
In order to comply with federally and state mandated ULSD specifications, the Refinery proposed to modify its existing *12 Diesel Hydrotreating Unit U-90 at the Wilmington plant (ULSD project). The ULSD project involved physical modifications primarily to the process facility at the Wilmington plant, which already produced low sulfur diesel, and minor control system improvements at the Carson plant. The two major components of the ULSD project were to: "(1) revamp the Midbarrel Hydrotreater Unit 90 [ (hydrotreater)] to decrease the hydrotreating reaction space velocity to meet the required diesel sulfur level; and (2) modify the midbarrel handling and logistics to segregate diesel from higher sulfur jet fuel."[2] The proposed modifications did not increase the Refinery's diesel production.

Refinery Permit.
Beginning in 1994, the SCAQMD developed the Regional Clean Air Initiative Market (RECLAIM) program, a marketbased system of controlling the emission of NOx and SOx, and the Refinery has operated pursuant to a RECLAIM permit since that time. (See Health & Saf.Code, § 39616.) In contrast to traditional "command-and-control" regulations which set specific limits on each piece of equipment and each process emitting air pollution, the RECLAIM program set a factory-wide pollution limit for each business and permitted the business to determine what equipment, processes and materials it would employ to meet that limit. (See generally Alliance of Small Emitters/'Metals Industry v. South Coast Air Quality Management Dist. (1997) 60 Cal.App.4th 55, 57-60, 70 Cal.Rptr.2d 54 [describing the RECLAIM program].) The RECLAIM program also permitted businesses that reduced emissions more than required to sell their excess emissions reductions to other businesses. Importantly, the RECLAIM program required that allowable emissions from all participating businesses be reduced each year.
The Refinery's RECLAIM permit specified annual allocations of NOx and SOx that were established on the basis of actual historical emissions and thereafter declined each year. It covered the combined emissions from the hundreds of pieces of Refinery equipment that emitted or had the potential to emit or control air contaminants. Issued in 1994, the Refinery's RECLAIM permit allowed the Refinery to emit up to 8,318 pounds per day (ppd) of NOxa figure based on the Refinery's 1994 emission level. As of 2003, the Refinery's NOx emission allocation had declined to 2,343 ppd. But under the RECLAIM program, the Refinery was still allowed to emit up to its initial allocation of 8,318 ppd so long as it purchased a corresponding amount of RECLAIM trading credits from another facility, that had reduced its emissions below its permitted RECLAIM level.

The SCAQMD's Environmental Review of the Project.

Negative Declaration.
As required by law, in December 2003, ConocoPhillips submitted its application for a permit to the SCAQMD. It requested that the permit be handled in accordance with a rule providing for express permit processing to enable a permit to be issued by August 2004. As required by the California Environmental Quality Act (CEQA), after receiving the permit application the SCAQMD undertook an initial study to determine the environmental impacts of the ULSD project. (Pub. Resources Code, § 21080(a).)
*13 In January 2004, the SCAQMD, as the lead agency for the ULSD project,[3] issued a draft negative declaration for the project, finding that it would have no significant impact on the environment and that mitigation measures were not required. The document was circulated for public comment. Appellants and others asserted there was a fair argument that the ULSD project may have adverse environmental impacts and that an environmental impact report (EIR) was required. Appellants submitted extensive comments prepared by environmental engineer J. Phyllis Fox, Ph.D., and hydrologist Matthew Hagemann in support of their position. The Los Angeles City Attorney also expressed concern about whether an EIR was necessary to analyze the ULSD project, given that "the negative declaration uses the level of emissions that ConocoPhillips is allowed to emit under existing permits as the baseline, even though ConocoPhillips may not have released that level of emissions in the past."
Concluding that there was no substantial evidence that the ULSD project would have a significant effect on the environment, the SCAQMD issued its final negative declaration (FND) in June 2004. Responding to specific public comments, the FND indicated that the baselinethe existing physical environmental conditions utilized for the ULSD project was appropriate, as it took into account emission levels allowed by existing permits. Thus, "[f]or the ULSD proposed project, the emissions associated with increased utilization of this existing equipment were considered baseline as opposed to proposed project because the Refinery holds valid permits to operate this equipment, and the equipment will continue to operate within their existing permit conditions and limits. The existing equipment operation, as well as increased utilization of the equipment (e.g., for increased steam generation) could, therefore, occur even if the proposed project did not commence (exist)."
Applying this baseline, the FND further concluded that the increased NOx emissions were less than significant. The SCAQMD calculated that during operation the ULSD project would cause an increase in NOx emissions of 8.9 ppd, which was below the CEQA significance threshold of 55 ppd. Appellants estimated the emission increases associated with increased utilization of steam generating equipment for the ULSD project at 237 to 456 ppd. This increase, too, was found to be less than significant when measured against the thresholds set by a combination of the RECLAIM program's initial emission allocation limit for the Refinery (8,318 ppd of NOx) and CEQA (55 ppd of NOx). Applying these thresholds, the FND provided that even emissions from increased capacity utilization from existing permitted equipment would remain less than significant at 2,799 ppd of NOx.
Further, the FND found that the ULSD project had no significant cumulative impact when considered together with emissions resulting from the Selective Catalytic Reduction (SCR) project at the Carson plant and other refineries in the South Bay area. In view of these conclusions, on June 18, 2004, the SCAQMD issued a notice of determination for a permit to construct the ULSD project.
On July 14, 2004, appellants filed petitions for hearing before the SCAQMD's Governing Board (Governing Board) and submitted additional comments from Dr. *14 Fox and Mr. Hagemann in support of their request. The Governing Board declined to hold a hearing on the issuance of a permit.

Addendum to the Final Negative Declaration.
In July and August 2004, Refinery workers participating in the excavation and site preparation work for the cooling tower replacement encountered petroleum-impacted soils on two occasions. Although the levels of benzene in the impacted areas did not by law require any special health and safety protections or procedures, the Refinery responded in accordance with applicable Occupational Health and Safety Administration (OSHA) regulations; the SCAQMD's approved Rule 1166, which is the soil mitigation plan governing the excavation, grading, handling and treatment of soil contaminated by petroleum and other volatile organic compounds; and its internal Industrial Hygiene Management Plan. As an additional protection, the Refinery employed the procedures required when contamination exceeds a certain safety threshold, requiring that workers use organic vapor respirators (gas masks) as a precaution within the site's perimeter.
On September 21, 2004, the SCAQMD certified an Addendum to the FND (Addendum) to present updated fugitive component counts.[4] The updated figures (17.2 ppd of VOCs) remained below the CEQA level of significance (55 ppd of VOCs). With respect to the discovery of contaminated soil, the Addendum concluded that the Refinery's compliance with OSHA regulations and its internal institutional controls rendered the contamination insignificant. The Addendum also responded to issues raised in two petitions filed before the Governing Board, including whether the RECLAIM program emission allocation should be used as the baseline for measuring emission significance, whether increased utilization of existing permitted steam generation equipment should be included as part of the ULSD project rather than the baseline and whether the cumulative impacts from the ULSD project would be significant. Concurrently with the Addendum certification, the SCAQMD's executive officer (Executive Officer) issued a notice of determination approving a permit for the ULSD project as revised.

Phase I Proceedings.

Pleadings.
On July 16, 2004, appellants filed two verified petitions for writ of mandate against the SCAQMD which alleged causes of action for violation of CEQA for the failure to prepare an EIR, the adoption of an illegal CEQA significance threshold, illegal approval of a negative declaration and issuance of findings, and illegal issuance of notice determination prior to project approval. Each petition sought a writ of mandate setting aside the SCAQMD's approval of a negative declaration for the project and directing the SCAQMD to comply with CEQA. The trial court consolidated the actions.
The SCAQMD answered in September 2004. Appellants filed amended petitions and complaints in September 2004 and again in October 2004 adding allegations pertaining to the level of permit review, contaminated soil and additional CEQA violations. In January 2005, appellants moved for a peremptory writ of mandate to direct the SCAQMD to set aside its decision approving the FND and all other permits relating to the ULSD project and *15 to enjoin the Refinery from taking further action on the ULSD project until the SCAQMD fully complied with CEQA. Also in January 2005, the trial court denied appellant's motions for stay and issuance of a preliminary injunction. The Refinery answered the amended petitions in March 2005.

Trial Court Ruling.
The trial court held a bifurcated trial on the matter in March 2005 and March 2006. The March 2005 trial involved the alleged CEQA violations, while the March 2006 proceedings involved the non-CEQA issues that were a part of the original litigation.
On August 1, 2005, the trial court filed a statement of decision and order adjudicating the first phase. It ruled that the SCAQMD properly determined there was no substantial evidence supporting a fair argument of significant adverse impacts stemming from the ULSD project. It concluded that appellants' estimates of NOx emissions during construction failed to demonstrate a significant impact because they were improperly premised on emissions from off-road vehicles, not the onroad vehicles that would actually be used during construction. With respect to the significance of NOx emissions during operation, the trial court framed the question as to whether emissions from preexisting and already permitted equipment should be attributed to the existing environmental settingi.e., the baselineor should be characterized as project increases. The trial court ruled that SCAQMD properly calculated the baseline for the ULSD project as including emissions from existing equipment, so long as those emissions remained within previously permitted levels. It found that the SCAQMD properly applied the significance threshold 55 ppd of NOx emissions to levels above the baseline emissions allowed by the Refinery's RECLAIM permit. Utilizing the same baseline, the trial court further concluded that the impact of the NOx emissions was not a cumulatively considerable contribution. Addressing soil contamination, the trial court found no evidence that the level of contamination found at the ULSD project site may cause any significant adverse impacts. Finally, the trial court ruled that the Addenduma document which does not require the same level of public review as an EIR or a negative declarationwas the proper means to address certain clarifications to the ULSD project.

Phase II Proceedings.

Regulation XVII.
The Prevention of Significant Deterioration (PSD) program, created under the federal Clean Air Act, required preconstruction review and permitting for major air pollution sources that had attained federal ambient air quality standards. (42 U.S.C. § 7475.) The program's goal was to ensure that new or modified sources of air pollution not cause areas with relatively clean air to degrade in quality. The EPA adopted regulations allowing states to adopt their own PSD programs. (40 C.F.R. § 52.21.) Though not specifically listed in the regulations, NOx was among the criteria pollutants subject to the federal PSD program. (40 C.F.R. § 52.21(b)(23)(i); see also 40 C.F.R. § 81.305.) Those regulations further enabled the EPA to "delegate" its permit review authority to the states. (40 C.F.R. § 52.21 (u).)
In 1988, the SCAQMD adopted Regulation XVII, entitled Prevention of Significant Deterioration, to obtain a delegation from the EPA to administer the PSD program. According to Rule 1701(b) contained within Regulation XVII, the Regulation was effective "upon delegation from the EPA." The EPA did not delegate *16 PSD authority to the SCAQMD until January 1997, when it determined that Regulation XVII met the requirements of the federal program and signed a written delegation agreement with the SCAQMD delegating authority from the EPA to the SCAQMD to implement the provisions of the federal PSD program.
In 2002, the EPA amended its New Source Review (NSR) rules for the PSD programs, which provided a number of elements that tended to relax the applicability requirements and thereby excluded from review some major modifications to large sources with potentially significant emission increases. (67 Fed.Reg. 80186-80289 (Dec. 31, 2002).) The EPA set March 3, 2003, as the deadline for permitting agencies to implement the revised PSD rules.
At a February 7, 2003 meeting, the Governing Board authorized the Executive Officer to request from the EPA recognition that Regulation XVII was as stringent and therefore equivalent to the EPA's revised PSD regulations; alternatively, in the event that the EPA failed to recognize equivalency, the Governing Board authorized the Executive Officer not to request any further delegation and to allow the EPA to terminate the delegation agreement and become the permitting agency for PSD sources otherwise governed by the SCAQMD. The EPA declined to construe Regulation XVII as equivalent to the amended federal regulations and determined that the SCAQMD could not continue to administer its PSD program without amending its own Regulation XVII to conform to the EPA amendments. (67 Fed. Reg. at pp. 80240-80241.)
The Governing Board declined to amend Regulation XVII. Consequently, on March 3, 2003, the EPA notified the SCAQMD that it was revoking and rescinding its authority to implement the PSD program for issuing and modifying federal permits for new and modified major sources of attainment pollutants. According to the EPA, the delegation agreement was premised on the EPA's determination that Regulation XVII met the requirements of 40 Code of Federal Regulations part 52.21. The EPA stated that, following the amendment of the PSD program, it had "determined that your Regulation XVII may no longer generally meet the requirements of 40 Code of Federal Regulations part 52.21 (as revised), and that we cannot ensure District permits issued pursuant to Regulation XVII will fully implement our regulations as revised." According to the federal register, in the area covered by the SCAQMDas well as areas governed by other permitting agencies whose regulations were inconsistent with 40 Code of Federal Regulations part 52.21 as revised"Region 9 [of the EPA] will resume issuing federal PSD permits as of the date the revisions to 40 C.F.R. § 52.21 take effect." (68 Fed.Reg. 19371 (Apr. 21, 2003).)
Thereafter, the California Legislature introduced Senate Bill No. 288 (Sen. Bill No. 288), later codified as the Protect California Air Act of 2003, effective January 1, 2004. (Health & Saf.Code, §§ 42500-42507; Veh.Code, § 9250.11.) In order to carry out Sen. Bill No. 288's expressed purpose of preventing federal "reforms" from exacerbating air pollution challenges, Health and Safety Code section 42504, subdivision (a), provided: "No air quality management district or air pollution control district may amend or revise its new source review rules or regulations to be less stringent than those that existed on December 30, 2002." (See also Health & Saf.Code, § 42502, subd. (g).)
According to bill analyses of Sen. Bill No. 288, the bill "[prohibits an air district *17 from changing its new source review rules or regulations that existed on December 30, 2002, if the amendments or revisions would exempt, relax, or reduce the obligations of a stationary source to meet specific requirements." (Sen. Nat. Resources Com., 3d reading analysis of Sen. Bill No. 288 (2003-2004 Reg. Sess.) as amended Sept. 4, 2003, p. 1; accord, Assem. Nat. Resources. Com., analysis of Sen. Bill No. 288 (2003-2004 Reg. Sess.) as amended June 27, 2003, p. 1.) A Senate Rules Committee report further explained: "SB 288 would enact the federal program that was repealed by the Administration as a state law. SB 288 will restore the clean air law to [the] same status as existed for 25 years until the end of last year. Section 116 of the Clean Air Act expressly allows the states to adopt clean air requirements more stringent than the federal government. If the federal government will not safeguard California's air quality, then the state must take this duty upon itself." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 288 (2003-2004 Reg. Sess.) as amended April 10, 2003, p. 6.) The Governor approved Sen. Bill No. 288 in September 2003 and it became effective on January 1, 2004. (Stats.2003, c. 476 (S.B.288), § 1.)
On September 21, 2004, the Executive Officer issued the first permit for the ULSD project. Acting in accordance with the Governing Board's earlier decision and determining that Regulation XVII was ineffective following the EPA's delegation revocation, the Executive Officer did not conduct any PSD review pursuant to Regulation XVII.[5] In April 2005, the Governing Board confirmed that the EPA had withdrawn its PSD delegation, thereby rendering the state unable to enforce Regulation XVII. It reaffirmed its previous action to relinquish PSD analysis back to the federal government and render Regulation XVII inactive unless the SCAQMD received a new delegation from the EPA or amended Regulation XVII to make it currently effective. It further opined that a PSD review would have had no effect on the ULSD project because it did not involve modifications to any equipment emitting PSD pollutants.

Subsequent Negative Declaration.
In June 2005, the SCAQMD prepared a subsequent negative declaration (SND) to evaluate the additional effects of the installation and operation of SCR technology to a replacement heater. While the FND had evaluated the impacts from installing and operating ultra low NOx burners to control NOx emissions from the heater, the SCAQMD determined during, the permit process that the best available control technology (BACT) would instead be SCR technology. The SND concluded that the modification would not have any significant environmental impacts. Appellants submitted comments to the SND, asserting that the SCR technology would have significant impactsparticularly from the use, storage and transport of ammonia and that the SCAQMD had improperly piecemealed the ULSD project. In October 2005, the SCAQMD certified the final SND and approved the project as revised.

Pleadings.
During the pendency of the superior court action, appellants separately appealed the SCAQMD's issuance of a permit for the ULSD project to the SCAQMD's Hearing Board (Hearing Board), specifically challenging the SCAQMD's failure to apply Regulation XVII. Following a hearing *18 lasting several days and spanning November 2004 to April 2005, the Hearing Board issued a written decision ruling that Regulation XVII was effective only so long as the PSD delegation by the EPA to the SCAQMD was valid; that Regulation XVII became ineffective on March 3, 2003 when the EPA withdrew its delegation of PSD permitting authority from the SCAQMD; and that the SCAQMD did not violate Sen. Bill No. 288 by allowing Regulation XVII to become ineffective upon the withdrawal of the delegation. The Hearing Board found, as a matter of law, that Regulation XVII did not apply to the SCAQMD's permit decisions relating to the ULSD project. One Hearing Board member issued a written dissent, concluding that nothing rendered Regulation XVII inactive at the time of permitting and that the "EPA's withdrawal of delegation to implement the federal PSD program did not inactivate Regulation XVII as a matter of local law."
Following the issuance of the trial court's ruling in Phase I, appellants filed third amended petitions challenging both the Hearing Board's decision denying their administrative appeal on the PSD issue and SCAQMD's failure to prepare an EIR to address the impact of the SCR technology.[6] Pursuant to a stipulation and order, appellants filed verified fourth amended petitions in November 2005.

Trial Court Ruling.
Following a March 2006 trial, the trial court issued an order denying appellants' petition for peremptory writ of mandate and a statement of decision in June 2006. Addressing Regulation XVII, it concluded that the Hearing Board did not abuse its discretion in upholding the Executive Officer's decision that Regulation XVII was ineffective when he issued the ULSD project permit in September 2004. It further found that a determination that Regulation XVII became ineffective upon the EPA's delegation revocation was not contrary to Sen. Bill No. 288, as the revocation occurred before Sen. Bill No. 288 became effective in January 2004 and the revocation did not violate Sen. Bill No. 288's prohibition against amending or revising new source review rules and regulations. (See Health & Saf.Code, § 42504, subd. (a).) With respect to the propriety of the SCAQMD's preparation of the SND as opposed to an EIR, the trial court ruled that substantial evidence supported the conclusion that there would be no significant impacts from the modified ULSD project and, specifically, from the addition of SCR technology. The trial court also found that the ULSD project had not been improperly segmented because the SCAQMD prepared multiple CEQA documents to analyze the project.
The trial court entered judgment on June 29, 2006. This appeal followed.

DISCUSSION
Appellants' two primary contentions are: (1) An EIR was required to evaluate the ULSD project because substantial evidence supported a fair argument that the project would have significant environmental impacts; and (2) the SCAQMD should have "applied Regulation XVII in evaluating the ULSD project. We agree with appellants that the FND did not adequately analyze the potential significant impacts stemming from the ULSD project's NOx emissions, but conclude that the SCAQMD properly evaluated other potential impacts and properly declined to apply Regulation *19 XVII in issuing a permit for the ULSD project.

I. The SCAQMD Abused Its Discretion in Concluding There Was No Substantial Evidence to Support a Fair Argument That the ULSD Project Would Have a Significant Environmental Impact.

A. CEQA Requirements and Standard of Review.
"CEQA is a comprehensive scheme designed to provide long-term protection to the environment. [Citation.] In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to be interpreted `to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (Mountain Lion Foundation v. Fish Game Com. (1997) 16 Cal.4th 105, 112, 65 Cal.Rptr.2d 580, 939 P.2d 1280.)
"The `heart of CEQA' is the EIR, whose purpose is to inform the public and government officials of the environmental consequences of decisions before they are made. [Citations.] In general, an EIR must be prepared on any `project' a public agency intends to approve or carry out which `may have a significant effect on the environment.' [Citations.]" (San Franciscans Upholding the Downtown Plan v. City and County of San Francisco (2002) 102 Cal.App.4th 656, 687-688, 125 Cal.Rptr.2d 745, fn. omitted.) As opposed to an EIR, "[a] negative declaration is a written statement that briefly explains why a project will not have a significant environmental impact and therefore will not require an EIR. [Citation.] A negative declaration is proper only if the agency determines based on an initial study that there is no substantial evidence that the project may have a significant effect on the environment. [Citations.]" (Mejia v. City of Los Angeles (2005) 130 Cal.App.4th 322, 330, 29 Cal.Rptr.3d 788 (Mejia); see also Snarled Traffic Obstructs Progress v. City and County of San Francisco (1999) 74 Cal.App.4th 793, 797, 88 Cal.Rptr.2d 455 ["In an obvious sense, an EIR and a negative declaration are the two sides of the same coin, the either/or options available to a public agency considering a project"].)
Under CEQA and its related administrative regulationsgenerally referred to as "Guidelines" (Guidelines) (Cal.Code Regs., tit. 14, § 15001 et seq.)  "`a significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment.'" (Pocket Protectors v. City of Sacramento (2004) 124 Cal.App.4th 903, 927 & fn. 17, 21 Cal.Rptr.3d 791 (Pocket Protectors); Pub. Resources Code, § 21068; see Guidelines, § 15382.) "The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data. An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area." (Guidelines, § 15064, subd. (b).)
Generally, an EIR is required when "`substantial evidence supports a fair' argument that a proposed project "may have a significant effect on the environment." [Citations.]....'" (Pocket Protectors, supra, 124 Cal.App.4th at p. 927, 21 Cal.Rptr.3d 791; accord, Sierra Club v. California Dept. of Forestry Fire *20 Protection (2007) 150 Cal.App.4th 370, 381, 59 Cal.Rptr.3d 9.) "`Substantial evidence' under CEQA `includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact.' (Pub. Resources Code, § 21080, subd. (e)(1).)" (Mejia, supra, 130 Cal.App.4th at p. 331, 29 Cal.Rptr.3d 788.) "The Guidelines define 'substantial evidence' as `enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence.' (Guidelines, § 15384, subd. (a).)" (Mejia, supra, at p. 332, 29 Cal.Rptr.3d 788; accord, Pocket Protectors, supra, at p. 927, 21 Cal.Rptr.3d 791.)
The fair argument test imposes low threshold for requiring the preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review. (No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 84, 118 Cal.Rptr. 34, 529 P.2d 66; Mejia, supra, 130 Cal. App.4th at p. 332, 29 Cal.Rptr.3d 788; Pocket Protectors, supra, 124 Cal.App.4th at p. 928, 21 Cal.Rptr.3d 791; Architectural Heritage Assn. v. County of Monterey (2004) 122 Cal.App.4th 1095, 1110, 19 Cal. Rptr.3d 469.) "Application of the `fair argument' test is a question of law for our independent review. [Citations.] We review the trial court's findings and conclusions de novo [citations], and do not defer to the agency's determination [citation], except on `legitimate, disputed issues of credibility' [citations]." (Bowman v. City of Berkeley (2004) 122 Cal.App.4th 572, 580-581, 18 Cal.Rptr.3d 814; accord, Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego (2006) 139 Cal.App.4th 249, 257, 42 Cal.Rptr.3d 537; Gentry v. City of Murrieta (1995) 36 Cal.App.4th 1359, 1399-1400, 43 Cal.Rptr.2d 170.)
As explained in more detail in Sierra Club v. County of Sonoma (1992) 6 Cal.App.4th 1307, 1317-1318, 8 Cal.Rptr.2d 473: "A court reviewing an agency's decision not to prepare an EIR in the first instance must set aside the decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental impact; in such a case, the agency has not proceeds ed as required by law. [Citation.] Stated another way, the question is one of law, i.e., `the sufficiency of the evidence to support a fair argument.' [Citation.] Under this standard, deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary. [Citation.]" (Accord, Sierra Club v. California Dept. of Forestry Fire Protection, supra, 150 Cal. App.4th at p. 381, 59 Cal.Rptr.3d 9.)
In reviewing an agency's decision, we "emphasize that the task of the judiciary is not to question the wisdom of proceeding with a project. Our purpose in reviewing environmental decisions is not to pass upon the correctness of a public entity's conclusions, but only upon the sufficiency of an EIR or negative declaration as an informative document. [Citations.] In so doing, we look to see whether policymakers have been adequately informed of the consequences of their decisions, and whether the public has sufficient information to evaluate the performance of their *21 elected officials. [Citation.] As a result, we must be satisfied that the particular governmental agency involved has fully complied with the procedural requirements of CEQA, because only in this way `can a subversion of the important public purpose of CEQA be avoided....' [Citation.]" (Long Beach Sav. Loan Assn. v. Long Beach Redevelopment Agency (1986) 188 Cal.App.3d 249, 259, 232 Cal.Rptr. 772.)
With these principles in mind, we turn to appellants' contentions.

B. There Was Substantial Evidence That NOx Emissions from the Project May Exceed the CEQA Significance Threshold.
Appellants first contend that an EIR was required because they presented a fair argument that the ULSD project would have a significant impact on air quality, as there was substantial evidence the project would generate operational NOx emissions exceeding the CEQA threshold.[7] The SCAQMD and the Refinery have consistently and successfully asserted that any increase in NOx emissions did not constitute a significant impact because the evidence showed that any estimate of projected increases fell within the level of NOx emissions allowed by the Refinery's RECLAIM permit. But annual emission levels reported in the FND demonstrated that the Refinery's NOx emission levels had not approached the over 8,000 ppd set by the RECLAIM permit. By utilizing the RECLAIM permit's maximum figure as the baseline for the ULSD project, the SCAQMD improperly calculated the baseline environmental setting on the basis of "merely hypothetical conditions" as opposed to "realized physical conditions on the ground." (San Joaquin Raptor Rescue Center v. County of Merced (2007) 149 Cal.App.4th 645, 658, 57 Cal.Rptr.3d 663 (San Joaquin Raptor Rescue Center).) Accordingly, the SCAQMD abused its discretion by reaching its conclusion of no significant impact from NOx emissions in a manner contrary to law.

1. Facts relating to NOx emission level calculations.
In the draft negative declaration, the SCAQMD concluded that the ULSD project would generate no increase in operational NOx emissions.[8] The draft negative declaration did not include any information about the Refinery's existing level of NOx emissions; rather, it stated only that the ULSD project would result in a net reduction of NOx emissions. On appellants' behalf, Dr. Fox submitted comments to the draft negative declaration in which she concluded that the ULSD project would generate approximately 560 ppd in NOx emissions from an increase in utilities necessary to support the increase in hydrotreating to reduce the diesel sulfur content. Relying on Dr. Fox's analysis, *22 appellants further commented that the SCAQMD's conclusion that the ULSD project would generate no NOx emissions employed an erroneous baseline, premised on the improper assumption there would be no impact from the Refinery's generating anything below the maximum permitted level of NOx emissions.
The FND presented slightly higher NOx emissions calculations, acknowledging that the ULSD project would generate an increase of 8.9 ppd of NOx emissions from an increase in delivery trucks to deliver additional catalysta figure below the CEQA significance threshold of 55 ppd. Responding to appellants' improper baseline argument, the SCAQMD for the first time explained that the Refinery operated pursuant to a RECLAIM permit and that it had relied on the permit conditions to calculate the baseline for the ULSD project. Thus, for NOx emissions from non-RECLAIM sourcese.g., delivery trucksthe baseline focused on the specific equipment to be added or modified: "The emissions baseline for new equipment ... is considered `zero,' and all emissions associated with such new equipment are considered emission increases resulting from the proposed project." For NOx emissions from RECLAIM sources, the SCAQMD used a baseline setting based on the emissions levels allowed by the RECLAIM permit. The FND summarized: "For both RECLAIM sources and non-RECLAIM sources, where the project will simply result in increased utilization of existing equipment, and the equipment will remain within the operating parameters specified in previously issued permits, emission calculations were not' presented in the Negative Declaration. This is because no discretionary approval is required for the increased utilization, and because the baseline emissions and the post-project emissions are the same, that is, they are both the permitted emissions."
Addressing the calculations rendered by Dr. Fox, the SCAQMD concluded that even if accurate levels of increased utilization of existing equipment were excluded from the baseline, any increases would remain below the level, of significance. More specifically, the SCAQMD calculated that, at worst, the ULSD project would involve increased utilization of the oldest boiler at the Refinery, the existing hydrogen plant and the existing electrical generation equipment, all of which together would result in increased NOx emissions of approximately 456 ppd. Calculating the baseline as the Refinery's initial RECLAIM allocation of 8,318 ppd' of NOx added to the CEQA significance threshold of 55 ppd, the SCAQMD reasoned that any emission level below 8,373 ppd would not be considered significant. Because the emissions associated with increased utilization of existing equipment (456 ppd), coupled with the Refinery's existing RECLAIM allocation (2,343 ppd), fell well below the 8,373 ppd level, the SCAQMD concluded that emissions would remain less than significant even under appellants' methodology.

2. Legal principles governing the de. termination of the baseline environmental setting.
"Before the impacts of a project can be assessed and mitigation measures considered, an EIR must describe the existing environment. It is only against this baseline that any significant environmental effects can be determined. (Guidelines, §§ 15125, 15126.2, subd. (a).)" (County of Amador v. El Dorado County Water Agency (1999) 76 Cal.App.4th 931, 952, 91 Cal.Rptr.2d 66.) According to Guidelines section 15125, subdivision (a): "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the *23 notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives." (See also Fat v. County of Sacramento (2002) 97 Cal.App.4th 1270, 1280-1281, 119 Cal.Rptr.2d 402 [addressing the adequacy of the baseline in a negative declaration as opposed to an EIR].)
In San Joaquin Raptor Rescue Center, supra, 149 Cal.App.4th 645, 57 Cal.Rptr.3d 663, the court highlighted the varying approaches to the determination of a project's baseline, stating: "Although the baseline environmental setting must be premised on realized physical conditions on the ground, as opposed to merely hypothetical conditions allowable under existing plans [citations], established levels of a particular use have been considered to be part of an existing environmental setting. [Citations.] `Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods.' [Citation.]" (Id. at p. 658, 57 Cal.Rptr.3d 663.) There, the question was whether the impacts from a mine expansion project should be measured against a baseline of a four-year average of mine operations (240,000 tons per year) or against the level of permitted mine operations (100,00 tons per year). (Ibid.) Although the court ultimately concluded that the EIR was inadequate because it failed to identify the baseline assumptions employed for assessing impacts, it reasoned that substantial evidence supported using established mine operations as the baseline. (Id. at pp. 658-659, 57 Cal.Rptr.3d 663.) Reiterating the principle that "established usage of the property may be considered to be part of the environmental setting," the court found that evidence of the mine's production average established such use, whereas the evidence of the more restrictive permit was not part of the record. (Id. at p. 659, 57 Cal. Rptr.3d 663.)
Applying established usage to determine a baseline environmental setting is not a new concept. In Environmental Planning Information Council v. County of El Dorado (1982) 131 Cal.App.3d 350,182 Cal. Rptr. 317 (EPIC), the court held that two EIRs prepared for the "Greenstone" and "Camino-Fruitridge" area plans were inadequate because they compared the environmental impact of those plans to the existing general plan rather than to the existing environment. For example, the Greenstone area plan EIR represented that the plan resulted in a reduction of the population holding capacity from over 70,000 persons to 5,800, and that such a reduction in density would thus result in no unfavorable impact on air quality. (Id. at p. 356, 182 Cal.Rptr. 317.) Similarly, the EIR and supplemental EIR for the Camino-Fruitridge area plan provided: "`The proposed plan "establishes a population holding capacity of 22,440 while the existing plan provides a population holding capacity of 63,600. A substantial population reduction is then realized.' .... `Intutively [sic] a population reduction of 65 would decrease any potential impacts by the same percentage.'" (Id. at p. 357, 182 Cal.Rptr. 317.) The court explained why the EIRs' comparisons to the general plan failed to evaluate the area plan's impacts: "The comparisons, however, are illusory, for the current populations of those areas are approximately 3,800 for the Camino-Fruitridge area and 418 for the Greenstone area. The proposed plans actually *24 call for substantial increases in population in each area rather than the illusory decreases from the general plan." (Id. at p. 358* 182 Cal.Rptr. 317.) The court concluded that both EIRs were insufficient as informative documents because they failed to consider the impacts that each area plan would have on the environment in its current state. (Id. at pp. 357-358, 182 Cal. Rptr. 317.)
Relying on EPIC, the court in City of Carmel-by-the-Sea v. Board of Supervisors (1986) 183 Cal.App.3d 229, 227 Cal. Rptr. 899 (City of Carmel), superseded by statute on other grounds as recognized in People ex rel. Brown v. Tehama County Bd. of Supervisors (2007) 149 Cal.App.4th 422, 450, 56 Cal.Rptr.3d 558, similarly concluded that whether a project may have a significant impact should be determined by comparing the project to the existing physical environment, not to what is possible under existing zoning. There, a hotel that was subject to a land use plan (LUP) permitting the development of up to 75 residential units on the site (Mission Ranch) sought rezoning of its property to permit continued use of the hotel and future residential development. (City of Carmel, supra, at pp. 233-234, 227 Cal. Rptr. 899.) Although the rezoning application generated controversy concerning its scope and its impact on adjacent wetlands, the county prepared a negative declaration to address the impact of the rezoning. (Id. at p. 234, 227 Cal.Rptr. 899.) The appellate court affirmed the trial court's order setting aside the rezoning decision, concluding that there was substantial evidence that the rezoning may have significant impacts. (Id. at pp. 241, 245, 227 Cal.Rptr. 899.) Importantly, in reaching this conclusion the court expressly rejected the argument that no significant impacts could result because the maximum number of units allowed under the rezoning would be 65, which was less than the 75 units already allowed under the LUP. The court explained: "In assessing the impact of the rezoning, it is only logical that the local agency examine the potential impact on the existing physical environment. The rezoning designation sought by Mission Ranch includes uses which do not presently exist and which would significantly expand the present resort hotel use. This is the effect which must be analyzed. A comparison between what is possible under the LUP and what is possible under the rezoning bears no relation to real conditions on the ground." (Id. at p. 246, 227 Cal.Rptr. 899.)
Indeed, multiple cases have held that CEQA requires that a proposed project must be evaluated by comparing the impacts of the project to the existing physical environment. (E.g., Woodward Park Homeowners Assn., Inc. v. City of Fresno (2007) 150 Cal.App.4th 683, 693, 707-710, 58 Cal.Rptr.3d 102 (Woodward Park) [EIR for proposed office and retail project held inadequate where it compared impacts of projectincluding NOx emissionsto the office and retail development that could be built under existing zoning, not to the existing physical condition of the property]; Fat v. County of Sacramento, supra, 97 Cal.App.4th at pp. 1280-1281, 119 Cal.Rptr.2d 402 [approval of negative declaration for proposed project upheld where impacts measured against actual physical condition of the property, despite that it had developed beyond what was allowed by permit]; Save Our Peninsula Committee v. Monterey County Bd. of Supervisors (2001) 87 Cal.App.4th 99, 118-128, 104 Cal.Rptr.2d 326 (Save Our Peninsula) [EIR for proposed residential development held inadequate where baseline water use figures were based on assumptions about water use that were unsupported by either existing conditions or evidence of historical use]; cf. Christward *25 Ministry v. Superior Court (1986) 184 Cal. App.3d 180, 190, 228 Cal.Rptr. 868 [CEQA review required for amendment to general plan to add a waste management facility even though such a facility may have been allowed under a special use permit; "the local agency is required to compare the newly authorized land use with the actually existing conditions," not with "hypothetically permitted facilities" that did not exist].) Succinctly summarized, these cases stand for the principle that "[a] baseline figure must represent an environmental condition existing on the property prior to the project." (Save Our Peninsula, supra, at p. 123,104 Cal.Rptr.2d 326.)
Another line of cases, however, appears to hold that permitted conditions constitute an appropriate baseline by which to measure a proposed project's environmental impacts. In Fairview Neighbors v. County of Ventura (1999) 70 Cal.App.4th 238, 82 Cal.Rptr.2d 436 (Fairview Neighbors), the EIR measured the traffic impacts from proposed modifications to a mining facility against the traffic levels allowed under an existing conditional use permit. Rejecting a challenge that the EIR should have measured the project's impacts against actual, existing traffic levels, the court found that "[t]he instant EIR appropriately assumes the existing traffic impact level to be the traffic generated when the mine operates at full capacity pursuant to the entitlement previously permitted by CUP-1328, as extended by the compliance agreement." (Id. at pp. 242-243, 82 Cal.Rptr.2d 436.) The court added that comparing the effects of the project against actual traffic figures would have been misleading because the mining operation's traffic flow fluctuated greatly over time based on varying levels of demand, production and other factors. (Id. at p. 243, 82 "Cal.Rptr.2d 436.) The court in Benton v. Board of Supervisors (1991) 226 Cal.App.3d 1467, 1473, 1476, 277 Cal.Rptr. 481 (Benton), also concluded that the impacts of a modified proposal for a winery should be measured against a winery that had already been approved and permitted. Likewise, in Committee for a Progressive Gilroy v. State Water Resources Control Bd. (1987) 192 Cal.App.3d 847, 863, 237 Cal.Rptr. 723 (Gilroy), the court held that an EIR was not required to evaluate the impacts of restoring a wastewater treatment facility's capacity to previously permitted levels.
A common and critical feature among the three foregoing cases was prior environmental review. In Benton, supra, 226 Cal.App.3d 1467, 277 Cal.Rptr. 481, the court noted that the project under review was merely a modification of a project which had-already been approved following environmental review and expressly distinguished EPIC and City of Carmel on the ground that those cases did not involve projects which had undergone earlier, final CEQA review. (Benton, supra, at p. 1477, fn. 10, 277 Cal.Rptr. 481.) The court in Fairview Neighbors, supra, 70 Cal.App.4th at page 242, 82 Cal.Rptr.2d 436, cited Benton in highlighting the fact that the project which constituted the baseline had already undergone environmental review. And in Gilroy, supra, 192 Cal.App.3d 847, 237 Cal. Rptr. 723, the court ruled not only that prior CEQA review was relevant to the determination of the baseline, but also that the reestablishment of a requirement previously approved under CEQA did not constitute a "project" subject to environmental review. (Id. at p. 863, 237 Cal.Rptr. 723 ["The reestablishment of discharge requirements within previously approved levels is merely a separate governmental approval of the original project and does not itself constitute a new project under *26 CEQA"].)[9]
Reconciling the two lines of authority, we conclude that a project's baseline is normally comprised of the existing environmental settingnot what is hypothetically allowed pursuant to existing zoning or permitted' plans. Where prior environmental review has occurred, though, the existing environmental setting may include what has been approved following CEQA review. The City of Carmel court clarified this distinction, responding to the argument that an EIR for the proposed development would be duplicative, since the scope of the project was already permitted by the LUP. (City of Carmel, supra, 183 Cal.App.3d at pp. 252-253, 227 Cal.Rptr. 899.) The court noted that environmental review was necessary to address the specific effects arising from the proposed project and importantly cautioned that "[t]he fact that County was following state law by conforming zoning to the LUP (Gov.Code, § 65860) does not by itself excuse preparation of appropriate environmental documents." (Id. at pp. 247, 253, 227 Cal.Rptr. 899.)

3. The SCAQMD abused its discretion by comparing the ULSD project's NOx emissions impacts to the maximum RECLAIM permit emission level.
In the FND, the SCAQMD relied on Benton and Fairview Neighbors in explaining its baseline calculations, stating "case law has held that the actual physical environment includes that which the operator has a legal right to build and operate under permits which have already been issued." Elaborating on its selection of the baseline as the maximum level of emissions allowed by the RECLAIM permit, the SCAQMD further explained: "For both RECLAIM sources and non-RECLAIM sources, where the project will simply result in increased utilization of existing equipment, and the equipment will remain within the operating parameters specified in previously issued permits, emission calculations were not presented in the Negative Declaration. This is because no discretionary approval is required for the increased utilization, and because the baseline emissions and the post-project emissions are the same, that is, they are both the permitted emissions." In other words, the SCAQMD calculated the baseline level of NOx emissions for the ULSD project as over 8,000 ppd, because that is the level allowed by the RECLAIM permit. In the alternative, the SCAQMD asserted that even if emission increases associated with existing equipment were not included as part of the baseline, they would remain less than significant because they would not exceed the RECLAIM permit levels. Thus, even the SCAQMD's worst case of 456 ppd of NOx emissions *27 would not trigger environmental review because those emissions would remain well below the permitted level of over 8,000 ppd.
We conclude that both of the SCAQMD's positions are flawed. The increased use of existing equipment must be evaluated as part of the project, not part of the baseline. Moreover, the SCAQMD's own estimates of the emissions resulting from that increased use constituted substantial evidence that the ULSD project may have a significant impact on the environment, as the emissions exceeded the CEQA significant threshold.

a. The increased use of existing equipment must be evaluated as part of the ULSD project, not part of the baseline.
According to CEQA, a "project" includes "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment," and which includes an activity supported in whole or in part by a public agency. (Pub. Resources Code, § 21065.) The Guidelines confirm that "`[p]roject' means the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Guidelines, § 15378, subd. (a).) The term "`"[p]roject" is given a broad interpretation in order to maximize protection of the environment.' [Citation.]" (Lighthouse Field Beach Rescue v. City of Santa Cruz (2005) 131 Cal. App.4th 1170, 1180, 31 Cal.Rptr.3d 901; accord, Friends of the Sierra Railroad v. Tuolumne Park Recreation Dist. (2007) 147 Cal.App.4th 643, 653, 54 Cal.Rptr.3d 500 ["CEQA's conception of a project is broad"].)
Guided by these principles, we conclude that any environmental review of the ULSD project must encompass the increased use of existing equipment outlined in the FND, including the increased utilization of existing steam generation equipment, hydrogen plant production and electrical generation equipment. The circumstances here are akin to those in San Joaquin Raptor Rescue Center, supra, 149 Cal.App.4th 645, 57 Cal.Rptr.3d 663, where the court found that an EIR inadequately analyzed the impact of a mining operation on the groundwater supply "because it fails to take into account and analyze the impact of substantially increased levels of production at the mine.... The conclusion in the EIR that water consumption will remain at current baseline levels, even after production is dramatically increased ... is not supported by substantial evidence or reasoned analysis."[10](Id. at p. 662, 57 Cal.Rptr.3d 663; see also Lighthouse Field Beach Rescue v. City of Santa Cruz, supra, 131 Cal.App.4th at pp. 1196-1197, 31 Cal. Rptr.3d 901 ["nothing in the baseline concept excuses a lead agency from considering the potential environmental impacts of increases in the intensity or rate of use that may result from a project"].)
We cannot agree with the SCAQMD's and the trial court's conclusion that increased emissions from existing equipment must be considered part of the baseline because those emissions would be allowed *28 by the RECLAIM permit. As discussed above, courts have accepted a baseline environmental setting premised on permitted levels where the permits were the result of prior environmental review. (See Fairview Neighbors, supra, 70 Cal.App.4th at p. 242, 82 Cal.Rptr.2d 436; Benton, supra, 226 Cal.App.3d at p. 1477, fn. 10, 277 Cal. Rptr. 481; Gilroy, supra, 192 Cal.App.3d at p. 863, 237 Cal.Rptr. 723.) Here, in contrast, there was no evidence that the impacts from the existing equipment that would be utilized as part of the ULSD project had ever been subject to environmental review. Rather, the record demonstrated that two of the four boilers that would serve as part of the steam generating equipment were constructed before the enactment of CEQA and thus had never undergone review. Though the other two boilers were constructed after CEQA, nothing in the FND indicated that they had been subject to environmental review. The cogeneration unit, which was also a part of the steam generating equipment for the ULSD project, was subject to CEQA review in 1987 and 1996, but the FND failed to apportion the emissions generated by that unit from those generated by equipment which had never been reviewed. There is thus no way to ascertain how much of the ULSD project's 456 ppd of NOx emissions would be generated by equipment never subject to CEQA review.
In view of the absence of prior environmental review, we are guided by the general rule that the baseline environmental setting must be premised on actual physical conditions on the ground, as opposed to merely hypothetical conditions allowable under existing plans or permits. (San Joaquin Raptor Rescue Center, supra, 149 Cal.App.4th at p. 658, 57 Cal. Rptr.3d 663; accord, Save Our Peninsula, supra, 87 Cal.App.4th at p. 123, 104 Cal. Rptr.2d 326; City of Carmel, supra, 183 Cal.App.3d at p. 246, 227 Cal.Rptr. 899.) According to the FND, the Refinery's NOx emissions did not approach the RECLAIM permit's upper limit of 8,318 ppd. Rather, the Refinery's NOx emissions during the period 1999 to 2003 ranged from a low of 3,249 ppd in 2001 to 2002, to a high of 4,592 ppd in 1999 to 2000. During the most recently period reported2002 to 2003the Refinery's NOx emissions averaged 3,567 ppd. The SCAQMD should have utilized these figures, as opposed to the maximum emissions figure allowed by the RECLAIM permit, as the ULSD project's baseline for NOx emissions.
We find no merit to the SCAQMD's assertion that, at a minimum, it had discretion to employ a different baseline than the actual conditions at the Refinery. (See Woodward Park, supra, 150 Cal.App.4th at p. 710, 58 Cal.Rptr.3d 102 ["The proposition that an agency sometimes can choose a baseline other than existing physical conditions is implicit in the Guideline's statement that existing physical conditions are `normally' the baseline"].) We do not find that the RECLAIM program or the policies behind it warrant the SCAQMD's employing a baseline that "bears no relation to real conditions on the ground." (City of Carmel, supra, 183 Cal.App.3d at p. 246, 227 Cal.Rptr. 899.) In the FND, the SCAQMD asserted that the RECLAIM program sufficiently addressed any impact arising from the use of existing equipment and that the program's NOx emission level should serve as the ULSD project's baseline "becauseregardless of the number of pieces of equipment at a RECLAIM facility or the variability' of operation and emissions from eachthe facility always must ensure that it operates within its allocation, or purchase RECLAIM trading credits from other RECLAIM facilities that have reduced their emissions." In view of the RECLAIM *29 program's emissions allocation method, the SCAQMD reasoned that "the baseline emissions and the post-project emissions are the same, that is, they are both the permitted emissions."
The problem with the SCAQMD's comparison is that it is illusory. While the maximum NOx emissions permitted under the RECLAIM program will remain the same both before and after the ULSD project, the FND demonstrated that the RECLAIM permit emission level was approximately twice the level of the Refinery's actual emissions during the four years preceding the inception of the ULSD project. In Woodward Park, supra, 150 Cal.App.4th 683, 58 Cal.Rptr.3d 102, the city similarly endeavored to choose a baseline based on "hypothetical conditions" allowable under a general plan, and the court held that the city lacked discretion to employ a baseline other than existing physical conditions. (Id. at p. 710, 58 Cal. Rptr.3d 102.) Explaining why a public agency lacks discretion under such circumstances, the court in City of Carmel, supra, 183 Cal.App.3d at page 246, 227 Cal. Rptr. 899, observed that using the maximum number of units allowed under a plan of development as the baseline for a project was misleading and obscured the fact that the proposed project "actually calls for substantial increases in population rather than illusory decreases." Here, too, employing a baseline figure premised on emission levels that far exceed the Refinery's actual emissions is misleading and subverts full consideration of the actual impacts that will result from the ULSD project. As in Woodward Park, "[t]here was no reason here why the usual rule requiring the baseline to be the existing physical environment would not apply." (Woodward Park, supra, at p. 710, 58 Cal. Rptr.3d 102.)
Nor does the fact that the ULSD project is intended to benefit the environment justify the SCAQMD's employing a heightened baseline to assess the project's impacts. As aptly stated in California Farm Bureau Federation v. California Wildlife Conservation Bd. (2006) 143 Cal.App.4th 173, 196, 49 Cal.Rptr.3d 169: "`[I]t cannot be assumed that activities intended to protect or preserve the environment are immune from environmental review. [Citations.]' [Citations.] There may be environmental costs to an environmentally beneficial project, which must be considered and assessed." The Refinery's existing physical environmental setting should have been utilized as the ULSD project's baseline for ascertaining the impact of increased NOx emissions.[11]

b. Substantial evidence supported a fair argument that the ULSD project may have significant impacts in terms of NOx emissions.
On appellants' claim that an EIR rather than a negative declaration should have been prepared, we "look to see if there was substantial evidence to support the agency's conclusion it could not be 'fairly argued' the project would have a significant environmental impact. [Citation.] *30 If there is no substantial evidence to support the agency's conclusion a fair argument cannot be made that the project will have a significant environmental impact, then the agency's action in adopting a negative declaration amounts to an abuse of discretion by the agency and a failure to proceed in a manner required by law. [Citation.]" (Christward Ministry v. Superior Court, supra, 184 Cal.App.3d at p. 187, 228 Cal.Rptr. 868.)
Above, we concluded that substantial evidence did not support the SCAQMD's position that appellants failed to make a fair argument that the NOx emissions from the ULSD project may be significant because emissions from existing equipment should not be considered part of the baseline. We similarly conclude that substantial evidence did not support the SCAQMD's alternative position that NOx emissions would be insignificant because, even absent their inclusion in the project's baseline, they would remain below the significance threshold allowed by a combination of the RECLAIM permit and the CEQA significance threshold.
The Guidelines provide: "Each public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects. A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (Guidelines, § 15064.7, subd. (a).) Stated another way, "[a] `threshold of significance' for a given environmental effect is simply that level at which the lead agency finds the effects of the project to be significant; the term may be defined as a quantitative or qualitative standard, or set of criteria, pursuant to which the significance of a given environmental effect may be determined. Adopting thresholds of significance promotes consistency, efficiency, and predictability in deciding whether to prepare an EIR." (Communities for a Better Environment v. California Resources Agency (2002) 103 Cal.App.4th 98, 110-111, 126 Cal.Rptr.2d 441, fns. omitted (Communities for a Better Environment).) Nonetheless, an agency may not apply a threshold of significance in a manner that precludes consideration of other substantial evidence demonstrating that there may be a significant effect on the environment. (Mejia, supra, 130 Cal. App.4th at p. 342, 29 Cal.Rptr.3d, 788; Communities for a Better Environment, supra, at p. 114, 126 Cal.Rptr.2d 441.)
Pursuant to Guidelines section 15064.7, the SCAQMD has adopted a significance threshold of 55 pdd for NOx emissions. In its responses to appellants' comments in the FND, the SCAQMD explained why it calculated the NOx significance threshold for the ULSD project differently from what the Handbook provides: "Air quality impacts for a RECLAIM facility are considered to be significant if the incremental mass daily emissions of NOx or SOx from sources regulated under the RECLAIM permit, when added to the allocation for the year in which the project will commence operations, will be greater than the facility's initial 1994 allocation (including non-tradable credits) plus the increase established in the SCAQMD Air Quality Handbook for that pollutant (55 pounds *31 per day (lbs/day) for NOx and 150 lbs/day for SOx)." Applying this formula, the SCAQMD calculated that NOx emissions falling below 8,373 ppd would be insignificant. The 8,373 ppd figure was comprised of the Refinery's 1994 RECLAIM allocation (8,318 ppd) and the CEQA significance threshold (55 ppd).
We cannot countenance the SCAQMD's construction of this significance threshold for a RECLAIM facility. The SCAQMD itself demonstrated the dramatic impact of this calculation taken to its logical conclusion. When it applied its 2003/2004 allocations for NOx emissions of 2,343 ppd, the SCAQMD conceded that under its "RECLAIM CEQA significance thresholds" "emission increases up to 6,000 lbs/day of NOx ... would be less than significant." Effectively, the SCAQMD's construing the RECLAIM permit level as the significance threshold would amount to a RECLAIM facility having a categorical exemption from CEQA. But given that the Legislature has already specified the types of projects and actions which are exempt from CEQA (Pub. Resources Code, §§ 21080, 21084), we are not at liberty to provide an additional exception for RECLAIM facilities. (Sierra Club v. State Bd. of Forestry (1994) 7 Cal.4th 1215, 1230, 32 Cal.Rptr.2d 19, 876 P.2d 505 [relying on the principle of statutory construction that "if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary," court rejected assertion that timber harvesting was exempt from CEQA, as the Legislature had not included that activity within any of CEQA's statutory exemptions]; see also San Francisco Unified School Dist. v. San Francisco Classroom Teachers Assn. (1990) 222 Cal. App.3d 146, 149, 272 Cal.Rptr. 38["[A] court engaged in statutory construction cannot create exceptions, contravene plain meaning, insert what is omitted, omit what is inserted, or rewrite the statute"].)
Rather, we are guided by the reasonable approach to applying CEQA significance thresholds discussed in County Sanitation Dist. No. 2 v. County of Kern (2005) 127 Cal.App.4th 1544, 27 Cal.Rptr.3d 28 (County Sanitation Dist. No. 2). There, the court questioned whether under the fair argument test there was a reasonable likelihood that the implementation of a project's "reasonably foreseeable disposal alternatives created a reasonable possibility of a significant effect on the environment." (Id. at p. 1587, 27 Cal.Rptr.3d 28.) The evidence showed that hauling biosolid waste to an acceptable remote location approximately 45 miles from the project would generate 63 ppd of NOx emissions. (Id. at p. 1588, 27 Cal.Rptr.3d 28.) Because that level of emissions exceeded the significance threshold of 55 ppd established by the San Joaquin Valley Unified Air Pollution District, the court concluded that the fair argument test supported the preparation of an EIR because the evidence showed that NOx emissions would have a significant adverse impact on air quality. (Ibid.)
In this case, the SCAQMD conceded that the ULSD project would generate a best case of 237 ppd of additional NOx emissions and a worst case of 456 ppd of NOx emissionsfigures ranging from approximately 400 to 900 percent of the CEQA significance threshold of 55 ppd. Guided by the holding in County Sanitation Dist. No. 2 that emissions exceeding the public agency's significance threshold by less than 15 percent supported a reasonable *32 inference of a significant adverse impact on the environment, we must conclude that the record here supported fair argument that the ULSD project's NOx emissions may have a significant effect on air quality. Consequently, the SCAQMD abused its discretion in preparing a negative declaration instead of an EIR for the ULSD project. (Mejia, supra 130 Cal. App.4th at p. 332, 29 Cal.Rptr.3d 788; Pocket Protectors, supra, 124 Cal.App.4th at p. 928, 21 Cal.Rptr.3d 791; Christward Ministry v. Superior Court, supra, 184 Cal.App.3d at p. 197, 228 Cal.Rptr. 868.)

4. The SCAQMD abused its discretion by failing to consider whether the ULSD project's NOx emission levels were cumulatively considerable.
The SCAQMD concluded in the FND that the ULSD project had no potential for cumulative adverse environmental impacts on air quality. It reached this conclusion on the ground that the individual emissions from the ULSD project fell below the CEQA significance thresholds. But because the SCAQMD's emissions calculations erroneously failed to account for increases from existing equipment, the SCAQMD likewise inadequately examined the cumulative effect of the project's emissions on air quality.
The CEQA Guidelines define cumulative impacts as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355.) "When assessing whether a cumulative effect requires an EIR, the lead agency shall consider whether the cumulative impact is significant and whether the effects of the project are cumulatively considerable. An EIR must be prepared if the cumulative impact may be significant and the project's incremental effect, though individually limited, is cumulatively considerable. `Cumulatively considerable' means that the incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future-projects." (Guidelines, § 15064, subd. (h)(1); see Pub. Resources Code, § 21083, subd. (b)(2).)
The need to consider the environmental impact of a project in conjunction with probable future projects stems from the fact that "consideration of the effects of a project or projects as if no others existed would encourage the piecemeal approval of several projects that, taken together, could overwhelm the natural environment and disastrously overburden the man-made infrastructure and vital community services. This would effectively defeat CEQA's mandate to review the actual effect of the projects upon the environment." (Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles (1986) 177 Cal. App.3d 300, 306, 223 Cal.Rptr. 18.) For this reason, appellate courts have established that "`the relevant question'" in a cumulative impacts analysis "is not how the effect of the project at issue compares to the preexisting cumulative effect, but whether `any additional amount' of effect should be considered significant in the context of the existing cumulative effect." (Communities for a Better Environment, supra, 103 Cal.App.4th at p. 120, 126 Cal. Rptr.2d 441, fn. omitted; see also Los Angeles Unified School Dist. v. City of Los Angeles (1997) 58 Cal.App.4th 1019, 1025, *33 68 Cal.Rptr.2d 367; Kings County Farm Bureau v. City of Hanford (1990) 221 Cal. App.3d 692, 718, 270 Cal.Rptr. 650.)
Here, appellants proffered substantial evidence supporting a fair argument that the ULSD project may have a significant cumulative effect on air quality. Dr. Fox calculated that the operational NOx emissions from past, present and future projects in the vicinity of the ULSD project totaled 8,559 ppda figure well over the 55 ppd CEQA significance threshold and one exceeding even the SCAQMD's combined RECLAIM and CEQA significance threshold of 8,383 ppd. Notably, the projects that Dr. Fox listedwhich included projects at the Refinerywere those that SCAQMD identified in its cumulative impacts analysis in a December 2003 draft environmental impact report for the Paramount Refinery's Clean Fuels Project. In contrast to the report prepared for the Paramount project, the FND contained no cumulative impacts analysis. Where an EIR similarly failed to address "whether any additional amount of traffic noise should be considered significant in light of the serious nature of the traffic noise problem already existing around the schools," the court in Los Angeles Unified School Dist. v. City of Los Angeles, supra, 58 Cal.App.4th at page 1025, 68 Cal.Rptr.2d 367 found the document patently inadequate. Likewise, by failing to conduct any cumulative impacts analysis, the SCAQMD failed to proceed in the manner required by law and abused its discretion. (See Joy Road Area Forest Watershed Assn. v. California Dept. of Forestry Fire Protection (2006) 142 Cal.App.4th 656, 676, 47 Cal. Rptr.3d 846.)
In response to appellants' comments to the FND, the SCAQMD offered several reasons why it was not required to prepare a cumulative impacts analysis, none of which we find persuasive. First, relying its calculation of 8.9 ppd of NOx emissions resulting from the ULSD project, the SCAQMD asserted that no cumulative impacts analysis was required because the project, alone, did not have any significant environmental effect. It buttressed this argument with figures from the SND showing that the project would actually result in a net decrease of NOx emissions when considered together with the development of SCR technology at the Carson plant. This argument failed to consider emissions from existing equipment at either the Wilmington or the Carson plant. While we are mindful of the admonition in Communities for a Better Environment, supra, 103 Cal.App.4th at page 120, 126 Cal.Rptr.2d 441, that the law does not provide "that any additional effect in a nonattainment area for that effect necessarily creates a significant cumulative impact," we note that even with the addition of SCR technology potential NOx emissions from the ULSD project exceeded 400 ppd. (Compare Leonoff v. Monterey County Bd. of Supervisors (1990) 222 Cal. App.3d 1337, 1358, 272 Cal.Rptr. 372 [lack of cumulative impacts analysis proper where "zero" environmental effects were expected from the project under study].)
The SCAQMD also criticized the geographic range of the projects identified in Dr. Fox's cumulative impacts analysis, noting that the Paramount Refinery was 13 miles from the Wilmington plant and that other projects in the Paramount area were also sufficiently distant from the ULSD project to avoid cumulative impacts. But the SCAQMD's comments failed to indicate what geographic area it did consider in finding no cumulative impacts and also *34 failed to explain why the Refinery's projects fell within the relevant geographic area for the Paramount Refinery's cumulative impacts analysis but the converse was not true. (See Guidelines, § 15130, subd. (b)(3) [in connection with the preparation of an EIR "[l]ead agencies should define the geographic scope of the area affected by the cumulative effect and provide a reasonable explanation for the geographic limitation used"].)
Finally, the SCAQMD asserted that the Guidelines did not require the preparation of a cumulative impacts analysis. It quoted a portion of section 15064, subdivision (h)(3) of the Guidelines, which states: "A lead agency may determine that a project's incremental contribution to a cumulative effect is not cumulatively considerable if the project will comply with the requirements in a previously approved plan or mitigation program which provides specific requirements that will avoid or substantially lessen the cumulative problem (e.g., water quality control plan, air quality plan, integrated waste management plan) within the geographic area in which the project is located. Such plans or programs must be specified in law or adopted by the public agency with jurisdiction over the affected resources through a public review process to implement, interpret, or make specific the law enforced or administered by the public agency."
While the ULSD project was designed to comport with the control measures identified in the AQMP that would facilitate compliance with state and federal diesel fuel requirements, the evidence nonetheless showed that the ULSD project may have a significant cumulative effect on air quality. Under these circumstances, we must apply the unquoted balance of the relevant Guidelines section, which provides: "If there is substantial evidence that the possible effects of a particular project are still cumulatively considerable notwithstanding that the project complies with the specified plan or mitigation program addressing the cumulative problem, an EIR must be prepared for the project." (Guidelines, § 15064, subd. (h)(3).) Because the issue here, however, involves the SCAQMD's failure to conduct any cumulative impacts analysis, the concluding, mandatory provision of Guidelines section 15064, subdivision (h)(3) does not yet come into play. In a comparable situation, where an agency failed to consider the cumulative effects of an improperly-defined project, the court in Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo (1985) 172 Cal.App.3d 151, 167, 217 Cal.Rptr. 893, explained that a court may not independently assess omitted material by determining whether its consideration would have affected the lead. agency's decision. Thus "we cannot exercise our independent judgment on whether the ultimate decision of the lead agency would have been different had CEQA been properly implemented because such a decision is for the discretion of the agency. [Citations.]" (Id. at pp. 167-168, 217 Cal.Rptr. 893.) The ultimate decision of whether the ULSD project's cumulative NOx emissions impacts necessitate an EIR rests first with the SCAQMD, following an adequate analysis of such potential cumulative impacts.
C.-D.[**]

*49 DISPOSITION
The judgment denying appellants' petition for writ of mandate is reversed to the extent it concluded that appellants had not presented a fair argument that NOx emissions from the ULSD project created a potentially significant adverse environmental impact. In all other respects, the judgment is affirmed and the matter is remanded to the trial court to direct the SCAQMD to reevaluate the potential environmental significance of the NOx emissions resulting from the project in a manner that is consistent with the views expressed herein. Parties to bear their own costs on appeal.
We concur: BOREN, P.J., and ASHMANN-GERST, J.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts I.C. & D. and II.
[1] Health and Safety Code section 40447.6 authorizes the SCAQMD to regulate the composition of diesel fuel manufactured for sale in the South Coast Air Basin, subject to approval by the California Air Resources Board (CARB), which promulgates statewide clean air standards. (See Health & Saf.Code, § 39606, subd. (a)(2).)
[2] A hydrotreater is a machine that treats hydrocarbons; a hydrocarbon is an organic compound containing hydrogen and carbon commonly occurring in petroleum, natural gas and coal.
[3] The "lead agency" is "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (Pub. Resources Code, § 21067.)
[4] Fugitive components include project components such as valves, flanges and pumps that may produce leaked or "fugitive" emissions of volatile organic compounds (VOCs) when in operation.
[5] In October 2004, the EPA determined that the ULSD project was not subject to its PSD permitting requirements set forth in 40 Code of Federal Regulations part 52.21(a)(2).
[6] Appellants initially filed an appeal before the Hearing Board, but later consented to a dismissal of their claims with prejudice by reason of their pursuing the same claims in superior court.
[7] Appellants frame the same argument in two ways. First, they contend that an EIR was required because they presented substantial evidence in the form of expert testimony that the ULSD project would generate NOx emissions exceeding the CEQA significance threshold of 55 ppd. Second, they contend that an EIR was required because the SCAQMD used an improper baselinei.e., it did not include any emission increases from existing equipment falling within permitted levelsto determine that any increase in NOx emissions from the ULSD project were below the CEQA significance threshold. But given that appellants' expert calculated her emissions figures by including the use of existing equipment as a project impact, appellants' substantial evidence argument is simply a restatement of its improper baseline argument.
[8] The SCAQMD further concluded that the ULSD project would generate an increase of 74.12 ppd of NOx emissions during construction, which fell below the CEQA significance threshold of 100 ppd.
[9] Though the SCAQMD and the Refinery cite Bloom v. McGurk (1994)'26 Cal.App.4th 1307, 31 Cal.Rptr.2d 914 as authority among this line of cases, that case did not address the determination of a baseline environmental setting. There, the court held a medical waste facility that sought permit renewal without any change in its operations was categorically exempt from CEQA. (Bloom v. McGurk, supra, at pp. 1314-1316, 31 Cal. Rptr.2d 914.) The court also held that no EIR was required because the facility was not increasing its permitted capacity. (Id. at pp. 1316-1317, 31 Cal.Rptr.2d 914.) That ruling did not hinge on any finding that the facility's permitted capacity constituted its baseline; rather, the evidence showed that the facility had consistently operated below its permit level, thereby rendering inapplicable Public Resources Code section 21151.1, subdivision (a)(1)(A)(ii), which provided that an EIR was necessary for a project involving "`[t]he expansion of an existing facility which burns hazardous waste which would increase its permitted capacity by more than 10 percent.'" (Bloom v. McGurk, supra, at p. 1316, 31 Cal.Rptr.2d 914.)
[10] We note that the SCAQMD's April 1993 CEQA Air Quality Handbook (Handbook), excerpts of which are part of the administrative record, similarly describes operational emissions from a project as including those which "result from natural gas combustion and the use of electricity and equipment for manufacturing processes" and provides that the SCAQMD should endeavor to quantify all operation-related emissions from a project, including "emissions from area sources (pool heaters, water heaters, boilers)...."
[11] In the SND, the SCAQMD modified its NOx emissions calculations to account for the addition of SCR technology, reasoning that NOx emissions from both an existing heater and a replacement charge heater would be reduced. Applying an 8.9 ppd NOx emission level for the ULSD project, the SND calculated that NOx emissions would be reduced by 6 ppd assuming an average firing rate and 20 ppd assuming a maximum firing rate. These calculations, however, remained premised on the assumption that NOx emission levels from existing equipment should be considered as part of the baseline and thus did not account for the balance of over 400 ppd of NOx emissions resulting from increased equipment use necessary for the ULSD project.
[**] See footnote *, ante.