[No. A113774. First Dist., Div. One. Mar. 29, 2007.]

SIERRA CLUB et al, Plaintiffs and Appellants, v.
CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION,
Defendant and Respondent;
PHIL CAMPBELL et al., Real Parties in Interest and Respondents.

## COUNSEL

M. R. Wolfe & Associates, Mark R. Wolfe, John H. Farrow; Deborah Reames and George Torgun for Plaintiffs and Appellants.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Hackenbracht and Tifany Yee, Deputy Attorneys General, for Defendant and Respondent.

Spaulding McCullough & Tansil and Karin P. Beam for Real Parties in Interest and Respondents.

## OPINION

**MARCHIANO, P. J.**—Plaintiffs Sierra Club and Friends of the Gualala River appeal from an order of the trial court denying their petition for writ of mandate. Plaintiffs' petition challenged a decision of defendant California Department of Forestry and Fire Protection (CDF) to issue a timber conversion permit (TCP) for a site of timberland owned by respondents and real parties in interest Phil Campbell et al. (real parties), who sought the TCP so they could convert the timberland to a vineyard. CDF issued the TCP after adopting a mitigated negative declaration that concluded that the timberland conversion project would not have a significant impact on the environment, and thus did not require the preparation of an environmental impact report (EIR).

Plaintiffs contend there is substantial evidence to support a fair argument that the timberland conversion project may have a significant effect on the environment, thus requiring the preparation of an EIR. We agree and reverse.

## I.  FACTS

Real parties, Phil Campbell, June Campbell, Rex Campbell, Steve Campbell, and Karen Hay, own 88 acres of timberland on a ridgetop near the town of Annapolis in Sonoma County. The timberland is located within the Buckeye Creek watershed. The proposed vineyard operations could potentially have an impact on Buckeye Creek, Grasshopper Creek, Soda Springs Creek, and the Gualala River, all of which apparently lie within the Gualala River watershed. The Gualala river "supports coho salmon and steelhead trout," and has been listed as "sediment and temperature impaired" under section 303(d) of the federal Clean Water Act (Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.).

In April 2000, real parties applied for a TCP to convert the 88-acre site from timberland to a vineyard. Pursuant to the TCP, the conversion would occur over a five-year period. Real parties proposed to log existing timber, remove stumps and debris, plant a cover crop and vines, and install an irrigation system. Real parties proposed to use a two-acre surface area as a reservoir to provide water to the young vines. Apparently, the reservoir "will impound winter surface runoff and will not take groundwater or water from any existing watercourses." Vineyard operations would involve the use of herbicides and pesticides, which could include potentially hazardous substances.

In late July or early August 2001, CDF released a draft initial study and negative declaration (draft ND) for real parties' timberland conversion project. One of the attachments to the draft ND was an erosion control and mitigation plan, which discussed measures intended to mitigate the impact of the project on soil erosion and water quality.

The draft ND concluded the timberland conversion project "will not have an adverse impact on the forest resource," and "could not have a significant effect on the environment . . . ." Specifically, the draft ND found that the project had no "potential to degrade the quality of the environment, substantially reduce the habitat of a fish or wildlife species," and had only less than significant impacts that were "cumulatively considerable."

The draft ND was opened to public and agency comment. Received comments included a seven-page comment letter from the Department of Fish and Game (DFG) which opposed the draft ND and believed the project required an EIR.

We summarize DFG's comments:

—The project area was within the geographic range of the northern spotted owl, a federally listed threatened species. The project area contained 28 acres of foraging habitat and 35 acres of nesting and roosting habitat. DFG concluded that the project would restrict the range of the owl species and thus would create a significant impact on the threatened species.

—The draft ND and erosion control and mitigation plan failed to consider and adequately analyze the potential impact to steelhead trout from the diversion of water, including surface flow, for irrigation. "Most important, an evaluation of water quantity and quality available to juvenile steelhead during the summer months in dry years when vineyard operations are occurring, was not included in the impact analysis." DFG "believes that the proposed project could adversely affect salmonid habitats in Grasshopper Creek and Buckeye Creek, and result in the restriction of the range of steelhead in the watershed."

—The withdrawal of groundwater supplies from the onsite well and the construction of the reservoir "could negatively affect natural hydrologic processes important to the maintenance of viable, functioning aquatic resources near the plan area." The project documents did not mention "whether remaining water supplies would be adequate to meet the needs of downstream populations of steelhead trout."

—The erosion control and mitigation plan assumed there would be no increase in sediment as a result of the project, but acknowledged there could be a more definitive assessment of sediment yield. DFG believed that "further analysis performed by a qualified hydrologist or watershed geomorphologist would be appropriate to determine changes to water quality that could adversely affect steelhead trout and their habitats in Grasshopper and Buckeye Creeks."

—DFG rejected the conclusion of the erosion control and mitigation plan that there would be no significant potential of contamination from the use of fertilizers, pesticides and herbicides if state-approved chemicals were used and label instructions were followed. DFG believed there were potential adverse impacts to aquatic resources in Grasshopper and Buckeye Creeks in the event of accidental spills or improper use, handling and storage of chemicals. "A contingency plan was not outlined in the project documents that describes avoidance, minimization or compensation measures for potential

deleterious effects to downstream salmonids and aquatic habitats in the event of contaminated runoff entering the watercourse. As such, [DFG] disagrees that the proposed project would not have a substantial adverse impact . . . ."

—The approximately five miles of deer fencing proposed to protect the vineyard would "substantially interfere with wildlife behavioral patterns, and will result in significant impacts to the wildlife community."

—The project had cumulative considerable impacts to the spotted owl and steelhead trout habitat and populations.

DFG concluded that "the project documents fail to disclose and evaluate potential significant adverse impacts to biological resources on and adjacent to the plan area" and that "the project, as proposed, will degrade the quality of the environment in the Annapolis region of Sonoma County." DFG believed that CDF, as lead agency for the project, "should find . . . that the proposed 88-acre timberland conversion may have a significant effect on the environment, and should, therefore, require that an EIR be prepared for this project."

The Sonoma County Permit and Resources Management Department also commented, stating its belief that the draft ND was "incomplete and inconclusive" regarding several potential environmental impacts and requesting the preparation of an EIR. Hydrologist Dennis Jackson submitted a detailed comment letter, stating his belief that the draft ND was incomplete in many areas, including water quality, erosion control, and impact on coho salmon habitat. He also requested that an EIR be prepared.

The public comment period closed on September 7, 2001.[1] On November 7, 2001, the Coast Action Group filed a separate mandate action challenging CDF's grant to real parties of a "less than 3-acre conversion exemption," to allow real parties to convert 2.1 acres of the project site into an irrigation pond. Plaintiffs and CDF agree that plaintiffs were not parties to, and did not participate in, the Coast Action Group mandate litigation.

The Coast Action Group alleged that the less than three-acre conversion exemption amounted to illegal piecemealing of the timberland conversion project. Their mandate litigation eventually settled in June of 2004. Among other things, real parties agreed to rescind their application for the exemption "if and when the 88-acre [a]pplication is approved and adopted by CDF."

---

[1] There was substantially more public and agency comment on the 2001 draft ND, which we need not discuss in detail.

In May of 2004, CDF issued a mitigated negative declaration (MND). In the executive summary of the MND, CDF states: "A negative declaration was prepared for this project in 2001. Comments received from the public indicated that the project description did not accurately describe the full range of activities occurring in conjunction with this project. Specifically, a less-than-three-acre conversion exemption had been approved for an adjacent reservoir that was intended to irrigate the proposed vineyard. *To remedy this apparent piecemealing of the project CDF has prepared this mitigated negative declaration.*" (Italics added.)

It is clear from this language, and CDF so admits on appeal, that the lapse of three years between the 2001 draft ND and the 2004 MND, as well as the preparation of the 2004 MND, were due to the Coast Action Group mandate litigation and subsequent settlement. It is also clear, as plaintiffs and CDF agree, that CDF never approved the 2001 draft ND—indeed, it seems clear the MND supersedes the draft ND.

The MND concludes that, with the proposed mitigation measures contained in the MND, "all potentially significant effects" of the timberland conversion project "have been reduced to a level of less than significant . . . ."

Although we need not go into detail, the MND appears to be a mix of the new and the old. As CDF points out, the MND has a more thorough description of the environmental setting of the project area than the draft ND. The MND also includes a discussion of several potential significant environmental impacts that require mitigation and the mitigation measures proposed, as well as a mitigation monitoring and reporting plan. But the MND also includes environmental documentation submitted with the 2001 draft ND, including the March 2000 erosion control and mitigation plan, which is attached to the 2004 MND as exhibit D.

The MND concluded that impacts on water quality caused by increased sediment in the watershed area would be mitigated by not permitting logging operations between October 1 and April 1, requiring real parties to plant a cover crop prior to the winter, and by "the design and development of an Erosion Control Plan [to] mitigate runoff." (The erosion control plan is apparently not extant, but "shall be designed by a qualified engineer and administered by a vineyard management company.") By limiting logging operations to slopes of less than 20 percent, and with setbacks of 25 to 50 feet from watercourses, "the impact to water quality and fish and fish habitat will be insignificant."

As another mitigation measure regarding water quality, real parties must "[c]ease any and all water extraction from Grasshopper Creek for irrigation purposes," including groundwater flows hydrologically connected to the creek. Real parties must also disconnect irrigation lines from the well on the project site and from the instream diversion of Grasshopper Creek.

The MND concludes that these mitigation measures "will reduce potentially significant impacts [to water quality] to a level of less than significant."

With regard to the northern spotted owl, the MND included this mitigation measure: "A [b]iologist shall conduct Northern Spotted Owl Surveys prior to operations for the occurrence of the species within 1.3 miles of the operation."

The MND was opened for public comment between July 9 and August 10, 2004. CDF received comments from experts and laypeople in opposition to the MND. We summarize some of the pertinent comments as follows.

Peter Baye, Ph.D.: Dr. Baye, a coastal plant ecologist, submitted a six-page comment letter on August 2, 2004. He is a professional plant ecologist and botanist, with 25 years of experience "specializing in coastal plant communities and species . . . ." He has 12 years of experience preparing and reviewing environmental documents, including EIR's, for the San Francisco District of the United States Army Corps of Engineers (Corps), and as a private consultant for the California Coastal Conservancy. He also has 12 years of experience coordinating and preparing Endangered Species Act consultations for the Corps and the United States Fish and Wildlife Service (Service). Finally, he has five years of experience preparing endangered species recovery plans for the Service.

In Dr. Baye's opinion:

—The MND simply "assume[d] unconditionally" that the planned erosion control plan, to be designed by a qualified engineer, would be effective, without criteria or caps for sediment yield or a monitoring system.

—The application of fertilizers to highly transmissive sandy soils creates a significant potential for nutrient leaching to groundwater and eutrophication, a condition of increased algae production and thus a depletion of oxygen. This may cause a long-term impact to downstream steelhead habitat, and may further interact cumulatively with sedimentation impacts to further degrade

local stream steelhead habitat. "Nutrient enrichment of baseflows to adjacent waterways may also be exacerbated by potential significant net reduction in groundwater discharges, due to overdrafting of groundwater for irrigation or irrigation pond storage."

—The MND "provides no analysis or data on the effect of either ground-water (well) pumping or drafting creek water on summer low-flow conditions of adjacent creeks. The significant water demand for establishment of new vines (5 gallons/vine/week, 88 acres planted on 5 x 8 ft patter) requires analysis by a qualified hydrologist with expertise in groundwater dynamics to assess the potential for impacts on creek flows in normal and below-normal rainfall years, and associated summer survivorship of steelhead. Given the number of vineyard conversions in the assessment area, all establishing vines at the same time, there is a reasonable potential for significant cumulative impacts on survivorship of juvenile steelhead in summer channel bed pools of Gualala River tributaries in Annapolis. This potential requires rigorous analysis in a region-wide programmatic EIR, not cursory dismissal in an individual Negative Declaration."

—The timberland conversion project will result in the permanent loss of 63 acres of functional foraging, roosting, and nesting habitats of the northern spotted owl. This restriction in the range of the owl "should be considered a significant impact to this Federally threatened species." In addition, the expansion of patches of "agricultural open habitats" will have "indirect and cumulative effects on the distribution and abundance of predators" of the northern spotted owl. These impacts are "nowhere indicated or addressed, or mitigated," in the MND.

James Jordan, Jr.: Mr. Jordan is the secretary of plaintiff Friends of the Gualala River. On behalf of that organization, Jordan submitted a comment letter, dated August 3, 2004, focusing on the condition of the Gualala River watershed. Jordan stated that the Gualala River had suffered a degradation of habitat due to sedimentation and temperature increase caused by past logging. Referring to a number of applications for timberland conversions to vineyards in the watershed, Jordan believed that the conversions would have a cumulative adverse effect on the water quality of the Gualala River and on fish and wildlife habitat.

Jordan attached to his letter comments by a biologist and two hydrologists regarding two other TCP applications in the watershed. The commenting scientists referred to impacts to groundwater and surface water supplies, and

to adverse impacts to the Gualala River drainage downstream from the proposed projects, including increased sedimentation, higher water temperatures, and changes in surface flows, and consequent harm to the habitats of fish and other aquatic life.

Peter Ashcroft: Mr. Ashcroft is the conservation chair of the Redwood chapter of plaintiff Sierra Club, based in Santa Rosa. Ashcroft submitted a comment letter on August 9, 2004, in which he stated that the Redwood chapter "share[d] the concerns" expressed by Dr. Baye and Mr. Jordan. He commented that "[h]uman activities have resulted in excess sediment, high temperatures and reduced summer surface flows in the Gualala River and its tributaries, impairing the habitat of once thriving salmonids, which are now threatened with extinction. The Campbell project as currently proposed, in combination with other similar projects in the area, would contribute to the cumulative impact of this on-going destruction of salmonid habitat." Ashcroft also expressed a concern about surface water and groundwater depletion caused by irrigation, to the detriment of water supply and fish habitat. Ashcroft's letter referred to the expert assessments attached to the Jordan letter.

In April 2005, CDF issued its response to public comment.[2] On May 4, 2005, CDF found that in light of the MND there was no substantial evidence that the timberland conversion process would have a significant effect on the environment. That same date CDF approved the MND and issued real parties a TCP for the project.

On June 2, 2005, plaintiffs challenged the approval of the MND and the issuance of the TCP by filing a petition for writ of mandate. After briefing and oral argument, the trial court denied the petition: "The court has concluded that the proper standard of review is the 'substantial evidence' test rather than the 'fair argument' test sought by [plaintiffs]. It appears to the court that there is substantial evidence that the mitigated project does not have a substantial effect on the environment. Most of the information upon which the [plaintiffs] rely is either not substantial evidence or appears to be directed solely to the 2001 negative declaration. This court has determined that [CDF has] not abused [its] discretion, [has] proceeded in the manner required by law and that the decision is supported by substantial evidence."

---

[2] Again, as in the case of the public comment in 2001, there was considerably more public comment to the 2004 MND, which we need not review in this opinion.

## II. DISCUSSION

Plaintiffs contend that the trial court applied the wrong standard of review of CDF's decision to approve the MND, and should have applied the fair argument standard. CDF agrees, but argues the error is harmless. We disagree because plaintiffs produced substantial evidence to support a fair argument that the timberland conversion project may have a significant effect on the environment.

■ When it enacted the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA), "the Legislature sought to protect the environment by the establishment of administrative procedures drafted to 'Ensure that the long-term protection of the environment shall be the guiding criterion in public decisions.' " (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66], quoting Pub. Resources Code, § 21001, subd. (d).)[3] In essence, CEQA requires local agencies to prepare an EIR for any project which will have a significant effect on the environment. (§ 21151; *Citizen Action to Serve All Students v. Thornley* (1990) 222 Cal.App.3d 748, 753 [272 Cal.Rptr. 83].)

If a project is not exempt from CEQA and there is a reasonable possibility the project may have a significant environmental impact, the public agency must conduct an initial threshold study. If that study shows there will be no significant environmental impact, the agency may issue a negative declaration for the project. (*Citizen Action to Serve All Students v. Thornley, supra,* 222 Cal.App.3d at p. 753; *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1000 [165 Cal.Rptr. 514]; Guidelines, § 15070.)

"The decision to adopt a negative declaration and dispense with an EIR is essentially a determination that a project will have no meaningful environmental effect" and terminates the environmental review process. (*Citizen Action to Serve All Students v. Thornley, supra,* 222 Cal.App.3d at p. 754; see *Citizens of Lake Murray Area Assn. v. City Council* (1982) 129 Cal.App.3d 436, 440 [181 Cal.Rptr. 123].) Thus, CEQA imposes "a low threshold requirement for preparation of an EIR." (*No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 84; see *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 309–310 [248 Cal.Rptr. 352].) Generally, "a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.'

---

[3] Subsequent statutory citations are to the Public Resources Code. The administrative guidelines promulgated under CEQA, California Code of Regulations, title 14, section 15000 et seq., are cited in this opinion as "Guidelines."

[Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502]; see *No Oil, Inc. v. City of Los Angeles, supra*, 13 Cal.3d at p. 75.)

Both trial and appellate courts apply the same standard of review of an agency decision not to prepare an EIR. But as an appellate court, we are not bound by the trial court's findings. (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1577–1578 [27 Cal.Rptr.3d 28] (*County Sanitation*).) Plaintiffs and CDF agree that our review is de novo.

"The standard of judicial review of an agency decision to adopt a negative declaration is whether there is substantial evidence in support of a 'fair argument' of potential environmental impact." (*Citizen Action to Serve All Students v. Thornley, supra*, 222 Cal.App.3d at p. 754.) Substantial evidence " 'means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion . . . .' " (*Id.* at p. 755, quoting Guidelines, § 15384, subd. (a).) Substantial evidence does not include argument, speculation, or unsubstantiated opinions or concerns about a project's environmental impact. (Guidelines, § 15384, subd. (a); *Citizen Action to Serve All Students v. Thornley, supra*, 222 Cal.App.3d at p. 756; *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1352 [272 Cal.Rptr. 372].)

Thus, the fair argument standard of review is not the typical substantial evidence standard, i.e., whether there is substantial evidence to support the decision not to prepare an EIR. Rather, the fair argument standard of review is whether, after examining the entire record, there is substantial evidence to support a fair argument that a project may have a significant effect on the environment. This is a low threshold for the preparation of an EIR, reflecting a preference to resolve doubts in favor of full-blown environmental review. (*County Sanitation, supra*, 127 Cal.App.4th at pp. 1578–1580; *Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1109–1110 [19 Cal.Rptr.3d 469].)

"A logical deduction from the formulation of the fair argument test is that, if substantial evidence establishes a reasonable possibility of a significant environmental impact, then the existence of contrary evidence in the administrative record is not adequate to support a decision to dispense with an EIR. [Citations.]" (*County Sanitation, supra*, 127 Cal.App.4th at p. 1580; see Guidelines, § 15064, subd. (f)(1).)

CDF concedes the trial court erred by applying the substantial evidence standard of review, and agrees that the standard of review is whether there is "substantial evidence in the record supporting a fair argument that the proposed project may have a significant effect even after mitigation measures are taken." But conceding the error, CDF contends the error is harmless. We appreciate the concession of an obvious error. But we cannot agree that the error is harmless.

There is substantial evidence in the record to support a fair argument that the timberland conversion project, as mitigated, may have a significant effect on the environment. We look primarily to the detailed comment letter of Dr. Baye, a professional plant ecologist and botanist with a quarter-century of experience, which sets forth his expert opinion that the mitigated project may have a significant environmental effect in numerous areas: the significant effect of increased sediment due to erosion; the cumulative interaction of sedimentation and eutrophication on downstream fish habitat; the potential of net reduction in groundwater discharges due to irrigation; the effect of the significant demand for water for irrigation on the summer low-flow conditions of adjacent creeks; and the permanent loss of 63 acres of spotted owl habitat.

Baye's comments are specifically directed to the project and are not vague or speculative. His comments are supported by the comment letters of Mr. Jordan and Mr. Ashcroft. References to other timberland conversion projects in the same general area as the one under review are not necessarily irrelevant, given the potential for cumulative impacts. In any case, the Baye comments are singularly site specific.[4]

We thus conclude that plaintiffs met their burden of showing substantial evidence to support a fair argument that the mitigated project may have a significant effect on the environment. Thus, an EIR must be prepared, and the trial court erred by denying plaintiffs' challenge to the decision to approve the MND and issue the TCP.[5]

---

[4] We do not find compelling the trial court's assertion that some of the evidence in the administrative record was directed at the 2001 draft ND. We find substantial evidence of fair argument from expert opinion directed at the 2004 MND.

[5] We assume that potential cumulative impacts will be addressed during the EIR process.

We do not decide the issue of laches raised by real parties. The trial court found the doctrine "applicable," but expressly stated it "did not rely upon the doctrine in reaching its decision." CDF does not argue laches on appeal. In any event, the three-year delay between the 2001 draft ND and the 2004 MND was the result of the Coast Action Group litigation and CDF's improper piecemealing of the project.

## III. DISPOSITION

The judgment denying the petition for writ of mandate is reversed. The stay previously imposed by our issuance of a writ of supersedeas will remain in full force and effect until the remittitur issues.

Swager, J., and Margulies, J., concurred.