Filed 5/15/25  LaForest v. City of Mount Shasta CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

|  |  |
|---|---|
| DALE LAFOREST, | |
| Plaintiff and Appellant, | C099020 |
| v. | (Super. Ct. No. SCCV-CVPT-2021-765) |
| CITY OF MOUNT SHASTA et al., | |
| Defendants and Respondents; | |
| GOLDEN EAGLE CHARTER SCHOOL, | |
| Real Party in Interest and Respondent. | |

Golden Eagle Charter School (Charter School) sought approval from the City of Mount Shasta (City) to construct a new school facility.  After the City Council for the City adopted a mitigated negative declaration (MND) for the project under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1],

---

[1]  Undesignated statutory references are to the Public Resources Code.

1

Dale LaForest filed a petition for writ of mandate and complaint for injunctive relief challenging the decision. The trial court denied the writ petition and request for injunctive relief.

LaForest now contends the City failed to adequately analyze and mitigate significant aesthetic, noise, and air quality impacts, and engaged in piecemeal review of the project. We conclude substantial evidence supports a fair argument that the project may have a significant adverse aesthetic impact, requiring the preparation of an environmental impact report (EIR). We will reverse the judgment with directions to the trial court to grant the writ petition and issue a peremptory writ of mandate ordering the City to set aside its approval of the recirculated MND and cause an EIR to be prepared.

BACKGROUND

Charter School applied for a tentative parcel map and conditional use permit from the City for the construction of a new school facility for up to 200 students in kindergarten through 12th grade. The project would include an approximately 33,500 square foot building with two parking lots, a drop off/pick up area, a playground, a sound wall, two snow storage areas, a trash disposal area, and landscaping improvements. The tentative parcel map would merge 10 parcels and establish two parcels totaling about 12.4 acres. The school facility would be constructed on the south parcel (about 6.8 acres); the north parcel (about 5.6 acres) would remain an open space with wetlands.

The project site is on Pine Street within the City. The site is undeveloped with the exception of an old barn. It is in a high-density residential zone but an educational facility is an appropriate conditional use for the site. There is a hospital and medical offices east/northeast of the project site, on the other side of Pine Street. A senior housing facility is located about 600 feet north of the site. Multi- and single-family residences and a single-family dwelling unit used as office space are located to the south. Mount Shasta Elementary School is about .25 miles southeast of the project site. Interstate-5 is to the west.

The City is the lead agency for the project. It prepared an initial study which was made available for public and agency review in April 2019. The initial study evaluated the entire 12.4-acre project site. A public hearing on the initial study was held before the Mount Shasta Planning Commission in May 2019. A revised mitigated negative declaration and initial study (the recirculated MND) and a mitigation monitoring and reporting program were then prepared and recirculated for public and agency review. The recirculated MND stated that the project could result in aesthetic and other impacts but the project would not have a significant adverse impact on the environment because of design features, compliance with regulations and permit conditions, and mitigation measures in the recirculated MND.

Public hearings were held before the Planning Commission regarding the recirculated MND on October 6 and 20, November 17, and December 15, 2020. The City responded to 25 public comment letters. Additional public comments were included in the administrative record. Regarding aesthetic impacts, the City recognized that site and building plans were preliminary and did not provide sufficient detail to determine the project's consistency with the City's Design Guidelines and mitigation measure MM 4.1.1 in the recirculated MND. The revised mitigation measure provides:

"The building permit application shall be accompanied by a landscaping, signage, parking, lighting, building design, sound wall design, and snow storage plan in accordance with the City's Design Guidelines and applicable sections of the Mt. Shasta Municipal Code and California Building Standards Code. Where regulations conflict, the most restrictive shall apply. In addition, a trash storage plan and roof plan or other documentation that demonstrates that all trash storage containers and roof-mounted mechanical equipment are adequately screened from public view and adjacent properties must be submitted.

"Prior to issuance of each building permit, the plans shall be submitted to the Planning Commission for review and approval.

"Prior to approval, the Planning Commission shall make the following findings in accordance with the City's Design Guidelines:

3

a. The proposed building and site plan are consistent with the photographic examples shown in the guidelines of acceptable styles, elements, themes, materials, massing, detailing, landscaping, and relationships to street frontages and abutting properties.
b. The design of the proposed building or structure includes universally acceptable wall materials, or alternative treatments for panelized or prefabricated structures, identified in the guidelines under Color/Materials.
c. Roof design includes appropriate detail to match the surrounding structures, does not create glare, and is complementary in color to the building.
d. Design of the structure is sufficient to prevent vibrations or noise from sources internal to the structure from being detected at the property lines.
e. The proposed color scheme is consistent with the preferences identified in the guidelines under Color/Materials. The base color is a neutral color and the trim color accents or contrasts the base color.
f. The site plan demonstrates both motorized and non-motorized connectivity from the public right-of-way to the buildings and other site amenities.
g. The proposed development is in conformity with the standards of the City's land development code and other applicable ordinances insofar as the location and appearance of the building and structures are involved.

"Prior to issuance of a Certificate of Occupancy by the City's Building Official, the Building Official and City Planner shall verify that landscaping, signage, parking, lighting, building design, snow storage design, and screening of trash storage containers and roof-mounted mechanical equipment are consistent with the approved plans.

"Significant modifications to the approved plans shall be reviewed and approved by the Planning Commission."[2]

The Planning Commission adopted the recirculated MND, as amended, finding

no substantial evidence that the project as approved would have a significant adverse

---

[2] In comparison, the MM 4.1.1 in the recirculated MND states: "The building permit application shall be accompanied by a landscaping, signage, parking, lighting, building design, sound wall design, and snow storage plan in accordance with the City's Design Guidelines and Zoning Code. In addition, a roof plan or other documentation that demonstrates that all roof-mounted mechanical equipment is adequately screened from public view and adjacent properties must be submitted. Prior to issuance of each building permit, the City Planner or his/her designee shall review the plans to verify consistency with the Design Guidelines and Zoning Code. Prior to issuance of each Certificate of Occupancy by the City's Building Official, the Building Official and City Planner shall verify that landscaping, signage, parking, lighting, building design, and screening of mechanical equipment are consistent with the approved plans."

impact on the environment. LaForest and others appealed the decision to the City

Council. The City Council denied the appeal and affirmed the Planning Commission's

action. LaForest filed a petition for writ of mandate and complaint for injunctive relief

under CEQA against the City and its City Council (collectively respondents) challenging

the City Council decision.

The writ petition alleged that the recirculated MND did not adequately analyze

significant aesthetic, air quality, noise, and traffic safety impacts, and respondents did not

adopt adequate mitigation measures and improperly piecemealed the project. The petition

further alleged there was evidence creating a fair argument that the project may have

significant aesthetic, air quality, noise, and traffic safety impacts, requiring the

preparation of an EIR. The trial court denied the writ petition and request for injunctive

relief.

APPLICABLE LAW AND STANDARD OF REVIEW

The purpose of CEQA is to ensure the long-term protection of the environment

in public decisions. (§ 21001, subd. (d); *No Oil, Inc. v. City of Los Angeles* (1974)

13 Cal.3d 68, 74, superseded on another ground as stated in *Pocket Protectors v. City of

Sacramento* (2004) 124 Cal.App.4th 903, 929, fn. 18 (*Pocket Protectors*); see Cal. Code

Regs., tit. 14, § 15002, subd. (a).)[3] To that end, except in circumstances not applicable

here, the lead agency – i.e., the public agency with principal responsibility for carrying

out or approving a project – must conduct an initial study to determine whether the

project may have a significant effect on the environment. (§ 21067; Guidelines,

_____

[3] The State CEQA Guidelines are located at section 15000 et seq. of title 14 of the
California Code of Regulations (hereafter Guidelines). The Office of Planning and
Research prepared the Guidelines to help public agencies implement CEQA. (§ 21083,
subds. (a), (e).) The Guidelines are binding on all public agencies in California.
(Guidelines, § 15000.) We accord the Guidelines great weight in interpreting CEQA,
except where they are clearly unauthorized or erroneous. (*Center for Biological
Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 217, fn. 4.)

5

§§ 15002, subd. (k)(2), 15063, subd. (a), 15367.) "May" means a reasonability possibility. (*Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1035.) "Environment" refers to existing physical conditions in the area that will be affected by the project, including objects of aesthetic significance. (§ 21060.5; Guidelines, § 15360.) "Significant effect on the environment" means a substantial or potentially substantial adverse change in any of the physical conditions in the area affected by the project. (§ 21068; Guidelines, § 15382.)

An initial study must contain, in brief form, all of the following: (1) description of the project; (2) identification of the environmental setting; (3) identification of environmental effects by use of a checklist or other method with a brief explanation of entries on the form to indicate that evidence supports the entries and with pinpoint citations for references to other documents; (4) discussion of ways to mitigate the significant effects identified; (5) examination of whether the project would be consistent with existing zoning, plans, and other applicable land use controls; and (6) the name of the person(s) who prepared or participated in the initial study. (Guidelines, § 15063, subd. (d).)

The lead agency must prepare an EIR if it receives a fair argument, based on substantial evidence, that any aspect of the project may have a significant effect on the environment, even though it may also be presented with other substantial evidence that the project will not have a significant effect. (§§ 21080, subd. (d), 21082.2, subd. (d), 21100, subd. (a), 21151, subd. (a); Guidelines, §§ 15063, subd. (b)(1), 15064, subds. (a)(1), (f)(1); *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1111-1112 (*Berkeley Hillside Preservation*); *Sierra Club v. California Dept. of Forestry & Fire Protection* (2007) 150 Cal.App.4th 370, 381 (*Sierra Club*).) An EIR is a document describing and analyzing the significant effects the project may have on the environment. (Guidelines, § 15362.) It discusses ways to mitigate or avoid those effects, along with alternatives to the project. (§ 21061; Guidelines, § 15362.) An EIR is the

" 'heart of CEQA.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights Improvement Assn.*).)

Courts have described the fair argument standard as imposing "a low threshold for the preparation of an EIR, reflecting a preference to resolve doubts in favor of full-blown environmental review." (*Sierra Club, supra*, 150 Cal.App.4th at p. 381; see *Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 675; *Georgetown Preservation Society v. County of El Dorado* (2018) 30 Cal.App.5th 358, 370-371 (*Georgetown Preservation Society*).)  Whether a fair argument can be made that the project may have a significant effect on the environment is determined by examining the whole record before the lead agency.  (Guidelines, § 15384, subd. (a).)  "[And] whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data.  An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting.  For example, an activity which may not be significant in an urban area may be significant in a rural area."  (Guidelines, § 15064, subd. (b)(1).)

"Substantial evidence" means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.  (Guidelines, § 15384, subd. (a).)  It includes facts, reasonable assumptions predicated upon facts and expert opinion supported by facts.  (§§ 21080, subd. (e)(1), 21082.2, subd. (c); Guidelines, §§ 15064, subd. (f)(5), 15384, subd. (b).)  Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, and evidence that is not credible do not constitute substantial evidence.  (§§ 21080, subd. (e)(2), 21082.2, subd. (c); Guidelines, §§ 15064, subd. (f)(5), 15384, subd. (a).)

If the initial study shows there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment, the lead agency prepares

a negative declaration briefly describing the reasons the project will not have a significant effect on the environment. (§§ 21080, subd. (c), 21064; Guidelines, §§ 15063, subd. (b)(2), 15064, subd. (f)(3), 15070, subd. (a), 15371; *Berkeley Hillside Preservation, supra*, 60 Cal.4th at p. 1112.) The lead agency may instead prepare a mitigated negative declaration if the initial study identifies potentially significant effects but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the mitigated negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur, and (2) there is no substantial evidence, in light of the whole record before the agency, that the project as revised may have a significant effect on the environment. (§ 21064.5; Guidelines, §§ 15064, subd. (f)(2), 15070, subd. (b), 15369.5.)

A negative declaration must include, among other things, a copy of the initial study documenting reasons supporting the agency's finding that the project will not have a significant effect on the environment. (Guidelines, § 15071.) A negative declaration and mitigated negative declaration are subject to notice and public review requirements. (§§ 21091, 21092; Guidelines, §§ 15072, 15073.) The decision-making body of the lead agency must consider the negative declaration or mitigated negative declaration together with any comments received during the public review process before approving the project. (Guidelines, § 15074, subd. (b).) It may adopt the negative declaration or mitigated negative declaration only if it finds, on the basis of the whole record before it (including the initial study and any comments received), that there is no substantial evidence that the project will have a significant effect on the environment. (Guidelines, § 15074, subd. (b).)

We review the lead agency's decision to adopt a mitigated negative declaration de novo, except as to legitimate disputed issues of credibility, applying the fair argument test and considering the entire administrative record. (*Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 781 (*Newtown Preservation Society*);

8

*Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 580-581 (*Bowman*); *Citizens'*
*Committee To Save Our Village v. City of Claremont* (1995) 37 Cal.App.4th 1157, 1168.)
An EIR is required when there is substantial evidence supporting a fair argument that the
project may have a significant environmental impact, even if there is contrary evidence
that the project may not have a significant effect on the environment. (*Citizens'*
*Committee To Save Our Village,* at p. 1168.) The appellant bears the burden of
demonstrating by citation to the record the existence of substantial evidence supporting a
fair argument of significant environmental impact. (*Newtown Preservation Society,* at
pp. 781-782.)

DISCUSSION

LaForest contends the City failed to adequately analyze and mitigate significant
aesthetic, noise, and air quality impacts, and engaged in piecemeal review of the project.
Among other things, he argues the project violates the restriction contained in the City's
Design Guidelines that prefabricated metal buildings cannot be built in residential zoned
areas, and there is substantial evidence the proposed metal building would cause a
significant aesthetic impact.

A project's impact on aesthetics is a proper subject of CEQA review. (§ 21001,
subd. (b); Guidelines, §§ 15360, 15382 & Appen. G; *Save Our Capitol! v. Department of*
*General Services* (2023) 87 Cal.App.5th 655, 693 (*Save Our Capitol!*); *Protect Niles v.*
*City of Fremont* (2018) 25 Cal.App.5th 1129, 1141.) "Under CEQA, the issue of
aesthetics 'is not the judging of the individual beauty of the [p]roject, but rather [the]
physical elements of the preexisting environment the [p]roject may significantly
impact.' " (*Save Our Capitol!,* at p. 693.) In this regard, Appendix G to the CEQA
Guidelines prompts agencies to determine whether the project will substantially degrade
the existing visual character or quality of public views of the site and its surroundings.

The City acknowledged that its Municipal Code section on architectural review
and its Design Guidelines apply to the project. Chapter 18.60 of the Municipal Code

9

requires architectural review and approval of all proposed new projects requiring a building permit. Under that chapter, the City's Planning Commission must ensure that all projects comply with the City's Design Guidelines "to assure that the architecture and general appearance of buildings, structures, signs and grounds are in keeping with the character of their neighborhood and not detrimental to the orderly and visually harmonious development of the City . . . ." The Design Guidelines describe a design principle deemed appropriate for the City, called mountain village theme, characterized by "sloped roofs, attractive building facades that use natural materials such as stone and wood, and a color palate designed to complement rather than conflict with the surrounding forests and mountains." The Design Guidelines include photographic examples of the mountain village theme. For each design review, the Planning Commission must determine whether a proposed building and site plan is consistent with photographic examples of acceptable styles and whether the wall materials, roof design and color scheme of a proposed building are consistent with the Design Guidelines. The recirculated MND includes illustrations of four building design options and addresses whether the colors for those options are consistent with the Design Guidelines, but does not address whether the design options are compatible with the City's mountain village theme or satisfy the wall material and roof design requirements of the Design Guidelines.[4]

The Design Guidelines provide that prefabricated metal buildings are permitted as a principal building only within districts zoned as Controlled Manufacturing or General Industrial "or as may be provided in specific plans and/or planned development zone districts." The project calls for a steel building with a metal roof but is not in a

---

[4] The Planning Commission chose option 3 of the building design options when it approved the project. The exterior elevation for option 3 shows the building would have metal wall panels and a metal roof.

Controlled Manufacturing or General Industrial zone, and the recirculated MND does not address whether the Municipal Code allows a steel building at the project site or whether such a building is in keeping with the character of the neighborhood.

Chapter 18.70 of the Municipal Code governs the architectural design and site planning standards for the construction of any new building exceeding 20,000 square feet of gross floor area on a single parcel within any zoning district. The requirements aim to break up the apparent mass and scale of large structures and to protect existing residential areas and adjacent neighborhoods from encroachment of commercial land use. Large scale commercial development must be harmoniously integrated with its surroundings and meet mountain village theme guidelines. The recirculated MND states the proposed school building will have a floor area of approximately 33,500 square feet but does not discuss whether the building design options and site plan will meet large scale commercial development guidelines. Respondents assert on appeal that Chapter 18.70 of the Municipal Code does not apply to the project. However, other portions of the recirculated MND pertaining to landscaping and noise reference compliance with Chapter 18.70. In addition, a December 15, 2020 Planning Commission meeting document, and a January 25, 2021 City Council meeting document, state that the project must satisfy the requirements of Chapter 18.70 because of the size of the proposed school building.

Commenters objected to the size and appearance of the proposed school building, stating it was a metal "industrial commercial looking" structure and "one large box of a building," incompatible with a residential area and the alpine setting. LaForest raised concerns that the recirculated MND did not discuss how the project would comply with local requirements governing large scale commercial buildings and the prohibition against metal buildings in a residential zone. He compared the appearance of the proposed school building with photographic examples in the City's Design Guidelines of the mountain village theme and opined the metal warehouse appearance of the proposed

11

building would be inconsistent with the mountain village theme.  Other commenters raised similar concerns, including Dr. Eugene Tssui, a licensed architect and professor of architecture and city planning, and Jason Gillis, a Pine Street resident.

In response to comments relating to aesthetics, the City acknowledged that the building and site plans were not sufficiently detailed to determine consistency with the Design Guidelines.  It therefore revised mitigation measure MM 4.1.1 to require that the Planning Commission engage in future review of the building design, landscaping, signage, parking, lighting, sound wall design, snow storage, trash storage, and roof plans, to ensure compliance with the City's Municipal Code and Design Guidelines.  But stating that the project will be required to meet Municipal Code and Design Guideline requirements does not, in itself, satisfy the informational purposes of CEQA. (Guidelines, §§ 15003, subds. (b)-(d), 15063, subd. (c)(1); see *Save Our Capitol!, supra*, 87 Cal.App.5th at p. 696; *Georgetown Preservation Society, supra*, 30 Cal.App.5th at pp. 366-367, 372-374.)

Respondents cite portions of the record showing discussions by the project manager and City staff about the use of natural materials like rock to make a building façade "not look metal."  However, the recirculated MND does not include such a discussion.  Additionally, CEQA requires the lead agency (the City, and not the Planning Commission) to determine, before it approves a project, whether the project may have a significant environmental impact, and thus whether an EIR is required.  (§ 21080, subds. (c), (d); Guidelines, §§ 15063, subd. (b), 15064, subds. (b)(1), (f); *Laurel Heights Improvement Assn., supra*, 47 Cal.3d at p. 394.)  And if there is an insufficient opportunity for public review of the actual building design and other plans, the lead agency violates the public scrutiny requirement of CEQA.  (Guidelines, §§ 15064, subd. (c), 15073, 15074, subd. (b); see *Save Our Capitol!, supra*, 87 Cal.App.5th at pp. 675-678; *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307-308 (*Sundstrom*).)

12

The City's responses to public comments also do not explain whether the building design options shown in the recirculated MND are compatible with the City's mountain village theme or satisfy applicable Design Guidelines and Municipal Code requirements, or that the Municipal Code allows a steel building at the project site. And the City did not explain why it could not provide that information as to the building design options at the time of the recirculated MND. Respondents' appellate argument regarding the propriety of using specific performance standards via ordinances for mitigation does not address whether the project may have significant environmental effects.

Lay commentary may qualify as substantial evidence supporting a fair argument that significant impacts may occur where special expertise is not required and the opinion is supported by specific factual foundation in the record. (*Newtown Preservation Society, supra*, 65 Cal.App.5th at pp. 781, 789-791; *Georgetown Preservation Society, supra*, 30 Cal.App.5th at p. 376 & fn. 7 [stating that objections to the size and overall appearance of a project do not require special expertise]; *Pocket Protectors, supra*, 124 Cal.App.4th at p. 937 [stating that no special expertise is required regarding aesthetic impact].) In the context of the local regulations relating to aesthetics, the lack of discussion in the recirculated MND and responses to public comments, and the lay opinion about the appearance of the proposed school building, are sufficient to satisfy the low threshold for the preparation of an EIR. (*Georgetown Preservation Society,* at pp. 365, 375-377 [concluding that objections to size and overall appearance of a proposed 9,100 square foot chain retail store in the central district of a town known as a state historical landmark, where no similar structure existed, satisfied the low threshold needed to trigger an EIR]; *Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1336-1338 [requiring an EIR for a project to construct a large high-density residential building in a primarily single-family residential neighborhood]; *Sundstrom, supra*, 202 Cal.App.3d at p. 311 [stating that fair argument

13

may be based on the limited facts in the record if the agency has failed to study an area of possible environmental impact].)

*Bowman, supra*, 122 Cal.App.4th 572, a case respondents cite, is distinguishable. *Bowman* involved the demolition of a vacant commercial building and construction of a mixed use residential and commercial building along one of the most heavily used streets in the City of Berkeley. (*Bowman*, at p. 576.) The city council adopted a mitigated negative declaration after the design of the proposed building was subject to review by a Design Review Committee and the public and the developer twice changed the project's design to address concerns. (*Id.* at pp. 577-579.) Although objectors complained the building was too large to be aesthetically compatible with its surroundings, they endorsed a building that was one story shorter. (*Id.* at pp. 575, 578, 588.) In approving the project, the city council made detailed findings about how the project would be compatible in design and character to the applicable zoning district and adjacent neighborhoods. (*Id.* at pp. 584-586.) Based primarily on the project's setting and the fact it had undergone extensive design review to mitigate its visual impact, the Court of Appeal held there was no environmentally significant aesthetic effect that required an EIR. (*Id.* at p. 576.) The record before us does not show that the Charter School project had undergone the City's architectural review process, or would be located in a developed urban area, or that the aesthetic concerns of objectors relate only to a difference between a four-story and three-story building.

Because we conclude the City must prepare an EIR, we need not consider LaForest's other contentions regarding aesthetics and claims about significant noise and air quality impacts. (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1607, fn. 5.) To the extent installing solar panels is a reasonably foreseeable consequence of the project and will likely change the scope or nature of the project or its environmental effects, the EIR must include an analysis of the environmental effects of the installation of solar panels. (*Laurel Heights Improvement*

14

*Assn., supra*, 47 Cal.3d at p. 396; *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 293.)

## DISPOSITION

The judgment is reversed with directions to the trial court to grant the writ petition and issue a peremptory writ of mandate ordering the City to set aside its approval of the recirculated MND and cause an EIR to be prepared.  Appellant shall recover his costs on appeal.


　　　　　　　　　　　　　　　　／S／
　　　　　　　　　　　　　　　MAURO, Acting P. J.


We concur:


　　　／S／
KRAUSE, J.


　　　／S／
BOULWARE EURIE, J.